**This order is SIGNED.**

**Dated: December 14, 2018**



**WILLIAM T. THURMAN**
**U.S. Bankruptcy Judge**



## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| In re:<br><br>BLACK IRON, LLC,<br><br>                    Debtor | Bankruptcy No. 17-24816<br><br>Chapter 11 |
| WELLS FARGO RAIL CORPORATION<br>f/k/a FIRST UNION RAIL CORPORATION<br>and HELM PACIFIC LEASING,<br><br>              Plaintiffs,<br><br>vs.<br><br>BLACK IRON, LLC; CML METALS<br>CORPORATION; P.I.C. RAILROAD, INC.<br>d/b/a CML RAILROAD, INC.; and GILBERT<br>DEVELOPMENT CORPORATION,<br><br>             Defendant. | Adversary Proceeding Number: 17-2094<br><br>(Consolidated with Adv. Pro. No. 17-2088)<br><br>Honorable William T. Thurman |

### MEMORANDUM DECISION ON PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON ONLY THE PLAINTIFFS' CONVERSION CLAIM AGAINST BLACK IRON, LLC AND MEMORANDUM IN SUPPORT (DKT. NO. 399)

## I. Introduction

The matter before the Court is the Plaintiffs' Motion for Summary Judgment on

Plaintiffs' Conversion Claim against Black Iron, LLC and Memorandum in Support (the

"Motion") filed on October 15, 2018 at Dkt. No. 399. The Plaintiffs in this action will be collectively referred to as "Wells Fargo Rail" and the Defendants will be collectively referred to as "Black Iron." Wells Fargo Rail seeks summary judgment in its favor on its Eighth Claim for Relief for conversion against Black Iron. Black Iron filed a response to the Motion on November 12, 2018 at Dkt. No. 410. Wells Fargo Rail filed a reply on November 21, 2018 at Dkt. No. 419.

At the hearing on the Motion held on November 29, 2018, Troy Aramburu and Bret Evans appeared on behalf of Wells Fargo Rail. Dana Farmer and Blake Hamilton appeared on behalf of Black Iron. The Court heard oral argument, read the briefs filed by the parties, conducted its own independent review of the law and makes the following findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052. For a complete perspective on this ruling, the Court's Memorandum Decision on Defendants/Third-Party Plaintiffs' Motion for Summary Judgment on Black Iron, LLC's Claims and Memorandum in Support (Dkt. No. 67), entered on Dec. 5, 2018 at Dkt. No. 80 in Case No. 17-2088 (the "Memorandum Decision on Storage Fees") should also be considered as there is an unavoidable overlap of facts and law in the issues herein addressed.

## II. Jurisdiction, Venue and Notice

The jurisdiction of this Court is properly invoked under 28 U.S.C. § 1334, and has been expressly consented to by the parties. This is a core proceeding within the meaning of  28 U.S.C. § 157(b)(2), and this Court may enter a final order. Venue is proper under the provisions of 28 U.S.C. §§ 1408 and 1409. Notice of the hearing is found to be proper in all respects.

## III. Standard for Summary Judgment

Under Federal Rule of Civil Procedure 56(a), which is made applicable to adversary proceedings by Federal Rule of Bankruptcy Procedure 7056, the Court shall grant a motion for

summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

Substantive law determines which facts are material and which are not. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Whether a dispute is genuine turns on whether the evidence is such that a reasonable fact finder could return a verdict for the nonmoving party. The court does not weigh evidence or make credibility determinations at this point, *see id*. at 249, but is to decide whether there is a genuine issue for trial.

The moving party bears the burden to show that it is entitled to summary judgment. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). This burden includes properly supporting its summary judgment motion as required by Rule 56(c). *See Murray v. City of Tahlequah, Okla.*, 312 F.3d 1196, 1200 (10th Cir. 2002). Once the moving party meets this burden, "the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter." *Concrete Works of Colorado, Inc. v. City & County of Denver*, 36 F.3d 1513, 1518 (10th Cir. 1994) (citations omitted).

## IV. Factual Background

This dispute arose out of a lease transaction involving railcars and locomotives used in a mining venture near Cedar City, Utah.[1] Beginning in June 2010, Helm Financial Corporation, Wells Fargo Rail's predecessor-in-interest, and Helm-Pacific Leasing, as lessors, entered into four leases and related guaranties (the "Leases") with CML Metals Corporation ("CML Metals")

---

[1] Two adversary proceedings have been filed by the parties, and have been consolidated for purposes of discovery and trial, Case No. 17-2094 and Case No. 17-2088. A motion for summary judgment was filed in each case. Citations to exhibits filed in the companion case, 17-2088, will be specified in the footnotes. All other citations to the docket are referring to the instant case, 17-2094.

and PIC Railroad, Inc. d/b/a CML Railroad, Inc. ("CML Railroad"), for 540 railcars and four locomotives (the "Equipment"). During the next four years, CML Metals used the Equipment in its mining operations and surrounding real property then-owned by CML Metals (the "Property"). In October 2014, CML Metals suspended operations and stopped paying Wells Fargo Rail the payments due under the Leases. By letter dated November 20, 2014,[2] CML Metals asked Wells Fargo Rail to forbear from exercising available remedies in order to allow CML Metals an opportunity to be sold as a going concern. The Equipment remained on CML Metals' Property while CML Metals and Wells Fargo Rail began negotiating a forbearance agreement, and several drafts were exchanged up until March 2015.[3] However, the forbearance agreement was never signed. It is noted that Wells Fargo Rail is not an operating railroad, but rather a vehicle for financing railcars only.

On April 2, 2015, CML Metals, through its chairman Michael Conboy, entered into an Asset Purchase Agreement ("APA") with Steve Gilbert, President of Gilbert Development Corporation ("GDC") to transfer substantially all of CML Metal's assets to GDC. On April 29, 2015, GDC assigned its rights to receive CML Metal's assets under the APA to Black Iron. GDC remained obligated for several assumed liabilities that were listed in the APA. This asset purchase transaction closed on or about May 5, 2015. Since that date, Black Iron has owned the Property upon which the Equipment is located. While the land was now owned by Black Iron,

---

[2] *See* Dkt. No. 399, Exh. A. The letter from Chris Bradley, VP of Finance at CML Metals Corporation to First Union Rail states that as of Oct. 16, 2014, CML has shut down its mining operations. CML acknowledged its lease obligation, but stated that it was negotiating financial terms with potential purchasers, and asked that First Union Rail not bring a legal claim at this time. First Union Rail proposed a deferred payment schedule while it worked to complete an asset sale, and suggested that a buyer would "invest in the project and again utilize First Union's services."

[3] *See* Case No. 17-2088, Dkt. No. 68, Exh.T, pp. 7-8. Mr. Bowers, attorney for First Union Rail Corporation, stated that First Union would file a complaint against CML Metals if the attached forbearance agreement was not signed.

4

some of the railroad tracks were owned by Union Pacific Railroad Company or by CML Railroad.

Wells Fargo Rail did not know about the asset sale until after it had closed. On May 8, 2015, Steve Gilbert called Robert Bowers, an attorney representing First Union Rail Corporation (a predecessor of Wells Fargo Rail, which will be referred to simply as Wells Fargo Rail for ease of reference), and told Mr. Bowers that the railcars and locomotives would need to be removed or Black Iron would impose storage costs.[4] According to Steve Gilbert's recollection, Mr. Bowers said that Wells Fargo Rail would remove the railcars. The parties have submitted numerous email messages beginning in May and continuing throughout the summer of 2015 evidencing Wells Fargo Rail's efforts to coordinate the repair teams, inspectors and other personnel necessary to remove the 540 railcars and 4 locomotives from the Property which now belonged to Black Iron. There were issues about the condition of the tracks and the railcars, and the necessity for inspections and repairs. Wells Fargo Rail had communications about finding locations to store the railcars once they were moved off Black Iron's property.[5]

In mid-August, Steve Gilbert discovered that Wells Fargo Rail intended to file a lawsuit against Black Iron. On August 20, 2015, the individual at Black Iron who had been communicating with Wells Fargo Rail about moving the railcars sent an email stating:

> Please be advised due to legal issue pertaining to storage and security of the rail cars sitting on the Black Iron, LLC property these car cannot be moved until these issues are resolved. This is a notification to cease and desist the plan to start interaction on the cars next week.[6]

---

[4] Deposition of Steve Gilbert, Dkt. No. 68, Exh. A at 226 et seq.
[5] *See* Case No. 17-2088, Dkt. No. 71, Exh 6, p.6.
[6] Case No. 17-2088, Dkt. No. 68, Exh L. Email from Toni Cornforth of Black Iron to Andrew Sutherland at First Union Rail, dated Aug. 20, 2015 (errors in original).

Wells Fargo Rail canceled the repair vendor it had scheduled to arrive on the Property on August 24, 2015. While there is evidence that Steve Gilbert told representatives of Wells Fargo Rail that he would charge it $100 per day per railcar for storage, there is no evidence that Wells Fargo Rail ever agreed to pay this amount. In fact, Wells Fargo Rail repeatedly stated it intended to move the railcars, not pay storage.[7]

After the "cease and desist" email, no one traveled to the Property to physically work on the railcars to implement their removal, although emails dated throughout the fall of 2015 sent by and between individuals at Black Iron, Wells Fargo Rail, and Union Pacific (which owned some of the railroad tracks) contain discussion about the preparations necessary to move the railcars. This included inspecting the tracks, inspecting the railcars and locomotives, making necessary repairs to the railcars and locomotives, and arranging for personnel to travel to the property to conduct these activities.

On March 15, 2016, an attorney for Black Iron sent a letter to an attorney representing Wells Fargo Rail authorizing Wells Fargo Rail to enter the Property to repair and extract the railcars and locomotives.[8] Storage costs for the railcars were demanded in writing by letters dated April 4, 2016[9] and July 12, 2016.[10] Wells Fargo Rail hired a contractor in late spring 2016 to repair and move the railcars, and while there are email communications discussing the work necessary to move the railcars, no railcars were ever actually removed from Black Iron's Property because the repair vendor hired by Wells Fargo Rail stated that repairs were necessary before the railcars could be moved.[11] In July, 2016, a repair crew traveled from Missouri to Utah

---

[7] See Deposition of Steve Gilbert, Dkt. No. 396, Exh. 3 at 226-57; Declaration of Robert T. Bowers, Case No. 17-2088, Dkt. No. 68, Exh. T.
[8] See Case No. 17-2088, Dkt. No. 68, Exh. M, p.23. Letter dated March 15, 2016 from Erik Olsen to Douglas Farr.
[9] See Case No. 17-2088, Dkt. No. 68, Exh Q. Letter dated April 4, 2016 from Erik Olsen to Douglas Farr.
[10] See Case No. 17-2088, Dkt. No. 68, Exh M. Letter dated July 12, 2016 from Dana Farmer to Douglas Farr.
[11] See Case No. 17-2088, Dkt. No. 68, Exh I. Declaration of Andrew J. Sutherland.

with the vehicles and equipment to repair and extract the railcars.[12] However, on August 22, 2016, Black Iron sent a letter stating that the Equipment may not be removed without payment to Black Iron in the amount of $23,058,000 for storage costs.[13] Wells Fargo Rail has not paid that amount, and Black Iron has not allowed Wells Fargo Rail to access the Property and remove the Equipment. However, in June 2018, Wells Fargo Rail posted a bond in the amount of $10,000,000 in order to obtain permission to come on Black Iron's Property and remove the Equipment.[14] Shortly thereafter, fire restrictions prevented activity, and so Wells Fargo Rail did not have permission to enter Black Iron's Property until November 2018. The current status of removal efforts is uncertain.

## V. Legal Discussion

"In Utah, a cause of action for conversion exists when: (i) there is willful interference with personal property; (ii) without lawful justification; (iii) by which the person entitled to the property is deprived of its use or possession; and (iv) the party alleging conversion was entitled to immediate possession of the property at the time of conversion. Importantly, courts have found that while intentional conduct is required, conscious wrongdoing is not. As a result, the intent to exercise dominion is enough to satisfy a conversion claim." *Nilson v. JPMorgan Chase Bank, N.A.*, 690 F. Supp. 2d 1231, 1252 (D. Utah 2009) (internal citations omitted); *see also Bonnie & Hyde, Inc. v. Lynch,* 305 P.3d 196, 205 (Ct. App. Utah 2013); *Jones v. Salt Lake City Corp.*, 78 P.3d 988, 992 (Ct. App. Utah 2003).

### A. Willful Interference with the Equipment

---

[12] *See* Case No. 17-2088, Dkt. No. 68, Exh K. Declaration of Douglas P. Farr in Support of Motion for Prejudgment Writ of Replevin and Substitution of Collateral.
[13] *See* Case No. 17-2088, Dkt. No. 68, Exh. M, pp. 5-21. Letter dated Aug. 22, 2016 from Dana Farmer representing Black Iron to Douglas Farr representing Wells Fargo Rail.
[14] *See* Order Granting in Part Motion for Prejudgment Writ of Replevin and Substitution of Collateral, Dkt. No. 251, entered on June 11, 2018.

The Court must consider whether the facts previously stated constitute willful interference with the Equipment. While Wells Fargo Rail owned the Equipment, it did not own either the railroad tracks or the land underlying the railroad tracks. In order to access its Equipment, Wells Fargo Rail needed the cooperation of the owners of the railroad tracks and the land. Union Pacific, which owned at least some of the railroad tracks, cooperated in the efforts to inspect and repair the tracks so the Equipment could be removed.[15] Black Iron, as the owner of the underlying land, allowed access throughout the summer of 2015, and then withdrew permission for Wells Fargo Rail and its repair vendor to come on the Property to repair and remove the railcars. Without this permission, Wells Fargo Rail could not access its Equipment and carry out the substantial task of having a team of repair vendors move 540 railcars and 4 locomotives over miles of railroad track.

The fact patterns of cases discussing conversion include cases in which a party physically took chattel away from the complainant. *See Lawrence v. Intermountain, Inc.*, 243 P.3d 508, 514 (Ct. App. Utah 2010) (finding conversion when the Plaintiff gave the vehicle to another individual, thus frustrating the Defendant's efforts to recover the vehicle); *Firkins v. Ruegner*, 213 P.3d 895, 898 (Ct. App. Utah 2009) (finding conversion when Plaintiff removed the vehicles from Defendant's possession); *Nilson v. JPMorgan Chase Bank, N.A.*, 690 F. Supp. 2d 1231, 1252 (D. Utah 2009) (finding Defendants are likely to prevail on the claim for conversion because the Plaintiffs directed the payment of the distributions, which are personal property rightfully belong to the Defendants, for their own benefit when they knew or should have known that some or all of the payments were made wrongfully).

---

[15] *See* Case No. 17-2088, Dkt. No. 71, Exh. 13. Email string between Wells Fargo Rail and Union Pacific personnel about the condition of the railroad tracks and preparations to move the Equipment.

There are also cases in which a party prevented access to chattel, and that is also considered interference within the meaning of a conversion claim. *See Bennett v. Huish*, 155 P.3d 917, 928 (Utah Ct. App. 2007) (finding that plaintiffs were entitled to a refund of unused funds pursuant to an oral agreement, and so the defendant converted the funds when he refused to return them); *Margae, Inc. v. Clear Link Techs., LLC*, 620 F. Supp. 2d 1284, 1288 (D. Utah 2009) (finding that a claim for conversion was legally cognizable when the Defendant made it physically impossible for the Plaintiff to access the web pages at issue).

Accordingly, the Court concludes that when Black Iron withdrew permission for Wells Fargo Rail to come onto the Property to remove its Equipment, it willfully interfered with Wells Fargo Rail's personal property within the meaning of a conversion claim.

### B. Lawful Justification

Black Iron asserts that no conversion took place because it had a lawful justification in preventing access to the Equipment, i.e., Wells Fargo Rail delayed in removing the Equipment and then lost its right to remove the Equipment due to a possessory lien asserted by Black Iron for unpaid storage fees. The Court therefore turns to a consideration of whether or not Wells Fargo Rail unduly delayed in removing the Equipment, and whether or not Black Iron was lawfully justified in keeping the Equipment until Wells Fargo Rail had paid the amounts requested by Black Iron. The Court notes that this argument substantially overlaps Black Iron's claim for storage fees and trespass made against Wells Fargo Rail, and which was decided in the Memorandum Decision on Storage Fees. The same analysis from that case is repeated here.

### 1. Alleged Delay

Black Iron's first assertion is that Wells Fargo Rail unduly delayed in removing its Equipment. Black Iron informed Wells Fargo Rail that it needed to remove its Equipment on

May 8, 2015 and withdrew permission for Wells Fargo Rail to access the Property on Aug. 20, 2015. This time period was three months and twelve days. Prior to May 8, 2015, Wells Fargo Rail did not know that it would be required to move its Equipment.

Wells Fargo Rail submitted declarations, depositions and emails regarding the effort necessary to move the Equipment. The Declaration of Andrew Sutherland, the Vice-President for Fleet Maintenance at Wells Fargo Rail states:

> 5. From June 1-4, 2015, WFRC's inspection team inspected each of the 540 railcars and four locomotives (the "Equipment") and determined that the Equipment needed to be tested, and needed significant repairs, before it could be extracted. WFRC does not have the internal capabilities to perform tests and repairs on, or to operate, its railroad equipment and instead hires third-party vendors for those services.
>
> 6. Extracting the Equipment from the Property was going to be a substantial project given the number of railcars, their state of disrepair, the need for a qualified repair vendor willing to mobilize long distance to a remote location, the configuration of the tracks on the Property, and the various areas at which the Equipment was located across the Property. Of the 540 railcars, approximately 350 were located on tracks miles away from Union Pacific Railroad's main line interchange.
>
> 7. **By June 18, 2015, I identified a repair vendor, Holland/M Bar D ("Holland"), that was willing to mobilize to the Property. I coordinated with Toni Cornforth of Black Iron/Gilbert Development Corporation to have Holland begin its work during the week of August 24, 2015**. Assuming we had Black Iron/Gilbert Development Corporation's cooperation, I anticipated that the necessary testing and repairs for 184 railcars at Union Pacific Railroad's main line interchange would be completed around December 2015. Arrangements to access the Equipment located away from Union Pacific's main line interchange were not determined with sufficient certainty to estimate a schedule for their removal.
>
> 8. WFRC also arranged for transportation and storage of its Equipment at Progress Rail Services' facility in Parsons, Kansas.
>
> 9. WFRC had multiple telephone conferences, including one on August 11, 2015, with Union Pacific regarding transportation and logistics for the extraction of the 184 railcars at Union Pacific's main line interchange as well as the remaining Equipment located elsewhere on the Property.[16]

---

[16] Declaration of Andrew J. Sutherland, Case No. 17-2088, Dkt. No. 68, Exh. I (emphasis added).

Accordingly, Wells Fargo Rail had contracted with a repair vendor by June 18, 2015. It was

apparently the repair vendor's schedule that determined the Aug. 24, 2015 start date, and Toni

Cornforth at Black Iron was aware of this. There is no evidence that Black Iron communicated to

Wells Fargo Rail that this start date was unreasonable.

In its briefing and at the hearing, Black Iron cited to the emails and efforts made by Wells

Fargo Rail during the summer of 2015 to inspect, repair and prepare its Equipment for removal.

It asserts that Wells Fargo Rail moved slowly and unduly delayed. However, any hints of

impatience are missing from the contemporaneous emails themselves. In an email dated June 18,

2015, Cyndi Gilbert, an attorney for Black Iron, stated that "We appreciate FURC's

professionalism in inspecting the cars, etc. . . . in making this transition as painless as

possible."[17] An email string between Cyndi Gilbert at Black Iron and Robert Bowers of Wells

Fargo Rail with dates ranging from July 30, 2015 through August 5, 2015 was submitted to

support the assertion that Wells Fargo Rail was actively working on moving the Equipment, and

there is no indication in those emails that Black Iron wanted Wells Fargo Rail to move faster or

was getting impatient.[18] Also missing is any indication that Black Iron informed Wells Fargo

Rail that the deadline to get the Equipment moved was approaching.

Black Iron asserts that the three and a half months between May 8, 2015 and Aug. 20,

2015 was a reasonable time period to move the Equipment, but does not support this assertion

with facts. *See* Fed. R. Civ. Pro. 56(c)(1)(A); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250

(1986) (stating that when a properly supported motion for summary judgment is made, the

adverse party must set forth specific facts showing that there is a genuine issue for trial). Within

---

[17] Case No. 17-2088, Dkt. No. 68, Exh. T, p. 20. Email from Cyndi Gilbert to Robert Bowers dated June 18, 2018.
[18] *See* Case No. 17-2088, Dkt. No. 68, Exh T, pp. 73-76. Emails between Cyndi Gilbert and Robert Bowers dated July 30, 2015 through Aug. 5, 2015

six weeks of being informed that the Equipment needed to be moved, Wells Fargo Rail had hired

a repair vendor. The repair vendor was to start work Aug. 24, 2015. Black Iron has not shown

facts that would demonstrate that it was an unreasonable delay to hire a repair vendor who

needed about eight weeks to mobilize a repair team to central Utah. After most of those eight

weeks had elapsed, Black Iron withdrew permission for the repair vendor to enter its Property on

only four days notice.

The contemporaneous communications and Steve Gilbert's deposition support the

conclusion that the withdrawal of permission to enter the Property was not based on the lapse of

a reasonable period of time to extract the Equipment, but was instead done in retaliation for the

filing of a lawsuit against Black Iron. In support of this, Wells Fargo Rail has submitted a

transcript of telephone calls in which Steve Gilbert described his decision to tell Wells Fargo

Rail it could no longer come on Black Iron's property to remove the railcars by stating that "I'm

going to hold the cars hostage"[19] and "I shut the railroad cars. They were moving them; I stopped

it. I said, no, no, no. If we're going to be in a fight, we're going to fight, but the cars has got a

lien on them for storage. And they didn't think that was very funny. . . . I'm fixing to raise some

serious hell."[20] In his deposition taken March 30, 2018, Steve Gilbert stated that the "cease &

desist" email on Aug. 20, 2015 was "triggered" by the filing of the lawsuit.[21]

The evidence points to the conclusion that Wells Fargo Rail was working with Black

Iron's cooperation to remove the Equipment and had hired a repair vendor which could start

work on Aug. 24, 2015. The evidence also supports the conclusion that Black Iron did not inform

---

[19] Case No. 17-2088, Dkt. No. 68, Exh. C, pp. 7-15. Transcript of a telephone call held Aug. 20, 2015 between Steve Gilbert and Brian Rothschild.
[20] Case No. 17-2088, Dkt. No. 68, Exh. C., pp. 1-6. Transcript of a telephone call held Aug. 21, 2015 between Steve Gilbert and Brian Rothschild.
[21] Dkt. No. 68, Exh. A, 272:23 – 273:3. Steve Gilbert's Deposition.

Wells Fargo Rail that the deadline would be Aug. 20, 2015, but that it caught Wells Fargo Rail

by surprise when Black Iron withdrew permission to come on the Property. Black Iron has not

submitted sufficient facts that would support a different conclusion.

The evidence shows, and is sufficient for the Court to find, that the Aug. 20, 2015

deadline to remove the Equipment from the Property was determined by the filing of a lawsuit,

and not by the passage of a "reasonable" period of time to extract the Equipment. The evidence

further shows, and is additionally sufficient for the Court to find, that Wells Fargo Rail was

taking reasonable steps to extract its Equipment. Black Iron's claim that Wells Fargo Rail unduly

delayed in its efforts to remove its Equipment is thus unavailing.

### 2. Alleged Possessory Lien

The next defense raised to conversion by Black Iron is the allegation that it had a valid

possessory lien on the Equipment, such that it was lawful for it to forbid entry to the Property

until Wells Fargo Rail paid the amount demanded. First, the Court notes that there was no formal

monetary demand made when permission was revoked on Aug. 20, 2015. According to the

evidence before the Court, Black Iron assessed storage fees of $2,494,420 in April 2016.[22] In

July 2016, the amount had increased to $16,468,750.[23] In August 2016, the amount was

$23,058,000.[24] Black Iron has argued the necessity and appropriateness of its claim for storage

costs, which were discussed by the Court in the Memorandum Decision on Storage Fees, and

those findings of fact and conclusions of law are incorporated herein by reference.

Black Iron's allegation that it held a "possessory lien" is not supported by a specific

statute or legal theory in the case law. However, at the hearing, Black Iron cited to Article 7 of

---

[22] *See* Case No. 17-2088, Dkt. No. 68, Exh. Q.
[23] *See* Case No. 17-2088, Dkt. No. 68, Exh. M, pp. 25-27.
[24] *See* Case No. 17-2088, Dkt. No. 68, Exh M, pp. 5-21.

the UCC as support for its possessory lien. Article 7 of the Utah Uniform Commercial Code includes a provision for a "warehouse lien" and the Court assumes this is what Black Iron refers to. *See* Utah Code Ann. § 70A-7a-209(1). As it appears Black Iron is relying on its claim for a warehouse lien when it refers to a possessory lien, the Court repeats the analysis of Black Iron's warehouse lien claim here.

Black Iron asserts that it is entitled to a statutory warehouse lien over the Equipment. Under Utah law, a "warehouse" may have a lien against a bailor "on the goods covered by a warehouse receipt or storage agreement." Utah Code Ann. § 70A-7a-209(1).

### a. Warehouse

The statute defines a "warehouse" as "a person engaged in the business of storing goods for hire." Utah Code Ann. § 70A-7a-102(m). Black Iron asserts that nothing in the statute requires that the person be solely engaged in the business of storing goods for hire. To support this assertion, Black Iron relies on *Enerco, Inc. v. SOS Staffing Services, Inc.*, 52 P.3d 1272 (Utah 2002). The court in *Enerco* considered whether a lease agreement conferred the status of warehouseman on the landlord. The tenant asserted that the landlord was liable as a warehouseman for the tenant's property losses. This is factually distinguishable from the present case, as there was no warehouse lien being asserted in *Enerco*. The court did allow for a broader definition of "warehouse" and stated that "the question of whether or not someone is a warehouseman depends upon whether he has accepted 'the responsibility of safekeeping the property of others entrusted to him.'" *Id.* at 1275 (quoting *Barlow Upholstery & Furniture Co. v. Emmel*, 533 P.2d 900, 901 (Utah 1975)). From this statement, Black Iron concludes that if a person expects to be paid to accept responsibility for storage and safekeeping of another's property, then that person is a warehouseman.

The Court is persuaded that with the right set of facts, an entity may be considered a warehouseman even if it is not primarily in the business of storing goods. However, Black Iron does not submit sufficient evidence that it accepted the responsibility for storage and safekeeping of the Equipment. Black Iron purchased the Property where the Equipment was located, and immediately asked Wells Fargo Rail to remove its Equipment. Wells Fargo Rail did not ask Black Iron to accept responsibility for storage and safekeeping of the Equipment, but began working to remove the Equipment. Black Iron then threatened to impose storage costs, and then denied Wells Fargo Rail access to the Property. The language in the *Enerco* case presupposes a party that wishes its chattel to be kept, i.e., the warehouseman accepts property entrusted to him by the owner. In this situation, from the evidence presented, Wells Fargo Rail had no desire to entrust its Equipment to Black Iron, and did not ask Black Iron to accept it. Black Iron retained the Equipment on its Property despite Wells Fargo Rail's desire to remove it. This conduct does not make Black Iron a warehouseman. *See, e.g., Mesa Development, Inc. v. Railroad Storage and Drayage, Inc.*, 2011 WL 8184136 (Utah Dist. Ct. 2011) (finding that no warehouse lien existed in the absence of a storage agreement, among other factors).

### b. Storage receipt or storage agreement

While the Court does not believe Black Iron would be considered a warehouseman under either the terms of the statute itself or by case law, the lack of a storage receipt or agreement further diminishes Black Iron's assertion of a warehouse lien. The Utah statute that allows a lien specifically references a "warehouse agreement or storage receipt." Utah Code Ann. § 70A-7a-209(1). As explained further in sections V.A. and B. of the Memorandum Decision on Storage Fees that addressed Black Iron's claim to have a storage contract, Wells Fargo Rail did not agree to store its Equipment on Black Iron's property. There was no oral agreement for storage, and

Black Iron's refusal to allow Wells Fargo Rail access to the Property did not create a storage agreement.

Black Iron asserts that it has a storage receipt, after a fashion. The evidence that Black Iron submits is to quote from an email dated Sept. 2, 2015 from attorney Robert Bowers, representing Wells Fargo Rail's predecessor, to Cyndi Gilbert, an attorney representing Black Iron. Black Iron quotes the email thus: "Recall that it was Black Iron/GDC that asked that the equipment be removed if [Wells Fargo Rail] wasn't willing to pay to store them in place." From this sentence, Black Iron asserts that Wells Fargo Rail acknowledged a storage agreement. However, the sentence is taken out of context. The pertinent section of the email is as follows:

> I'm sure you know about the "cease & desist" email [Wells Fargo Rail] received about its equipment extraction efforts. I understand that [Wells Fargo Rail] and UP [Union Pacific Railroad] had an on-site visit scheduled for last week that had to be cancelled due to Black Iron/Gilbert Development's "cease & desist." Given the relative timing, I suspect that halting [Wells Fargo Rail's] efforts to retrieve its equipment was in response to the claims that [Wells Fargo Rail] filed against Black Iron/Gilbert Development over the CML asset purchase. I don't see how delaying extraction of [Wells Fargo Rail's] equipment serves anyone's interests. Recall that it was Black Iron/GDC that asked that the equipment be removed if [Wells Fargo Rail] wasn't willing to pay to store them in place. You know that [Wells Fargo Rail] had been taking the steps necessary to retrieve its equipment. That was taking time given the condition that CML left the cars and locomotives in. . . . When we speak, please let me know if Black Iron/GDC will allow [Wells Fargo Rail], [Union Pacific] and their vendors on-site to complete the extraction process. . . .[25]

The full email makes it clear that Wells Fargo Rail did not want Black Iron to keep Wells Fargo Rail's Equipment. This is further supported by the Declaration of Robert C. Bowers, in which he states that he did not make any sort of storage agreement with Steve Gilbert or anyone else at Black Iron.[26] The Court finds that this email does not evidence a storage agreement or receipt.

---

[25] Case No. 17-2088, Dkt. No. 68, Exh. T, pp. 78-79. Email dated Sept. 2, 2015 from Robert T. Bowers to Cyndi Gilbert.
[26] *See* Case No. 17-2088, Dkt. No. 68, Exh. T. Declaration of Robert C. Bowers.

The case law relied on by Black Iron is unavailing as the cases are factually distinguishable. Black Iron quoted *Bush v. Lane* for the proposition that "Where one performs for another, with the other's knowledge, a useful service of a character usually charged for, and the latter expresses no dissent, or avails himself of the service, a promise to pay the reasonable value of the services is implied." *Bush v. Lane*, 326 P.2d 640-41 (Dist. Ct. App. Cal. 1958). Black Iron alleges that Wells Fargo Rail availed itself of storage services, and so gave rise to an implied promise to pay the value of the services. However, Wells Fargo Rail expressed dissent repeatedly and consistently, and so this case does not support Black Iron's claim to a possessory lien for storage.

"When goods are delivered to a warehouseman for storage and no warehouse receipt is issued at the time of delivery, an implied contract of storage arises containing those terms required by law." *George v. Bekins Van & Storage Co.*, 205 P.2d 1037, 1046 (Cal. 1949). This case is also factually distinguishable because the goods were never delivered to Black Iron for storage. The Equipment was left on the Property when CML Metals sold its assets to Black Iron, and Black Iron immediately asked that it be removed, and then prevented Wells Fargo Rail from removing the Equipment.

The Court concludes as a matter of law that Black Iron did not have a warehouse lien for storage fees.

### C. The person entitled to the property is deprived of its use or possession

The third element of a conversion claim is that the interference deprives the person entitled to the chattel of the chattel's use or possession. When Black Iron sent the original "cease and desist" email on Aug. 20, 2015, it ended Wells Fargo Rail's permission to enter the Property

and access the Equipment. This had the effect of depriving Wells Fargo Rail of the use and

possession of the Equipment.

In March 2016, permission was again granted for Wells Fargo Rail to retrieve its

Equipment. As before, Wells Fargo Rail contacted the same repair vendor who apparently

needed a couple of months notice before it could dispatch its team of mechanics, technicians and

their equipment to the Property. The repair vendor traveled from St. Louis, Missouri to the

Property near Cedar City, Utah in mid-July 2016 with service vehicles, tools, and inventory to

repair the Equipment and prepare it to be removed.[27] Wells Fargo Rail spent approximately

$484,000 on this removal effort.[28]

Before the repair vendor could complete its work, Black Iron conditioned permission to

remove the Equipment upon payment of $23,058,000.[29] This total reflected an alleged storage

cost of about $100 per railcar per day between June 1, 2015 and July 31, 2016. There is no

factual dispute that Black Iron demanded that amount, that Wells Fargo Rail declined to pay it,

and that Wells Fargo Rail did not continue its efforts to remove the Equipment after receiving

this demand. The legal question is whether or not a payment demand of $23,058,000 was

sufficient to deprive Wells Fargo Rail of the use or possession of its chattel.

The Court notes that the case law involving conversion claims do not require the chattel's

owner to go to extraordinary lengths to repossess the chattel. For example, in *Lawrence v.*

*Intermountain, Inc*., 243 P.3d 508, 514 (Ct. App. Utah 2010), the Plaintiff converted the vehicle

when he gave it to another individual, thus frustrating the Defendant's efforts to recover the

vehicle. The court did not require the rightful owner to track down the second individual. In

---

[27] *See* Case No. 17-2088, Dkt. No. 68, Exh. I, paragraphs 12-15. Declaration of Andrew J. Sutherland.
[28] *Id*. at paragraph 17.
[29] *See* Case No. 17-2088, Dkt. No. 68, Exh M, pp. 5-21.

*Firkins v. Ruegner*, 213 P.3d 895, 898 (Ct. App. Utah 2009), it was enough that the Plaintiff

removed the vehicles from Defendant's possession. The court did not require the Defendant to

look for the vehicles. Conversion was found in *Bennett v. Huish*, 155 P.3d 917, 928 (Utah Ct.

App. 2007) when the defendant did not return funds to the plaintiffs upon request. "All that is

required is that defendant exercise control over the chattel in a manner inconsistent with

plaintiff's right of possession." *Jensen v. Chicago & W. Indiana R. Co.*, 419 N.E.2d 578, 593

(App. Ct. Ill. 1981)

    In none of these cases did the court require the rightful owner to go to extraordinary

lengths to regain the chattel. Payment of $23,058,000 would be an extraordinary requirement to

satisfy. The payment of $100 per railcar per day requested by Black Iron is forty times higher

than the rate in the storage agreement that Wells Fargo Rail had entered into during that same

time period for Oregon Eastern Railroad to store the railcars for $2.50 per railcar per day.[30] The

Court concludes that, in the circumstances of this case, this demand for payment interfered with

Wells Fargo Rail's right to use and possess its chattel.

    **D. The party alleging conversion was entitled to immediate possession of the**
**property at the time of conversion**

    "An interest in the property which does not carry with it a right to possession is not

sufficient; the right to maintain the action may not be based upon a right to possession at a future

time. In short, a conversion does not occur until the defendant exercises control over property

that is inconsistent with the plaintiff's right of possession to that property." *Fibro Tr., Inc. v.*

*Brahman Fin., Inc.*, 974 P.2d 288, 296 (Utah 1999) (internal quotation marks and citation

omitted). *See also Jones v. Salt Lake City Corp.*, 78 P.3d 988, 992 (Ct. App. Utah 2003) (finding

---

[30] *See* Case No. 17-2088, Dkt. No. 68, Exh. I at paragraph 14. Declaration of Andrew J. Sutherland.

no conversion where the owner was legally forbidden to own firearms, and so was not entitled to immediate possession of the firearms).

Under the Leases, Wells Fargo Rail reserved the right to require CML Metals to return the Equipment upon default.[31] When CML Metals defaulted in October 2014, Wells Fargo Rail demanded payment and reassurance that CML Metals would continue to operate, and reserved its rights to other remedies.[32] As summarized previously, CML Metals and Wells Fargo Rail began negotiating a forbearance agreement, during which time both parties allowed the Equipment to remain on the Property. The Equipment remained on the Property when the Property was transferred to Black Iron under the Asset Purchase Agreement. A transfer of all or a substantial part of the Lessee's assets was also an act of default under the Leases.[33]

The Leases for the Equipment were not expressly dealt with in the Asset Purchase Agreement, and the parties appear to assume that the Leases with their rights and obligations did not pass to Black Iron. However, when the Lease was breached by CML Metals, Wells Fargo Rail had the right to recover its Equipment. Wells Fargo Rail was thus entitled to immediate possession of the Equipment.

## VI. Conclusion

The Court finds that sufficient evidence was submitted to persuade the Court that Black Iron converted the Equipment when it denied Wells Fargo Rail access to the Property in order to retrieve the Equipment. Black Iron did not carry its burden to submit evidence that would raise a genuine issue of material fact on the elements of conversion.

Therefore, Wells Fargo Rail's motion for summary judgment should be GRANTED.

---

[31] *See, e.g.,* Case No. 17-2088, Dkt. No. 68, Exh. D at paragraph 19(a)(iii).
[32] Dkt. No. 396, Exh. 28.
[33] *See, e.g.,* Case No. 17-2088, Dkt. No. 68, Exh. D at paragraph 18(e).

An order will be entered herewith.

## SERVICE LIST

Service of the foregoing **MEMORANDUM DECISION ON PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' CONVERSION CLAIM AGAINST BLACK IRON, LLC AND MEMORANDUM IN SUPPORT (DKT. NO. 399)** shall be served to the parties and in the manner designated below.

By CM/ECF Notification:

- Troy J. Aramburu    taramburu@swlaw.com, nharward@swlaw.com,docket_slc@swlaw.com,sballif@swlaw.com
- Bret R Evans    brevans@swlaw.com, nharward@swlaw.com;docket_slc@swlaw.com;sballif@swlaw.com
- Dana T. Farmer    dfarmer@djplaw.com, eirvin@djplaw.com
- Blake Hamilton      bhamilton@djplaw.com
- Douglas Farr    dfarr@swlaw.com, docket_slc@swlaw.com;bandrews@swlaw.com
- Ralph R. Mabey    rmabey@kmclaw.com
- Adelaide Maudsley    amaudsley@kmclaw.com, tslaughter@kmclaw.com
- Amy F. Sorenson    asorenson@swlaw.com, smoen@swlaw.com
- Brian M. Rothschild   BRothschild@parsonsbehle.com, ecf@parsonsbehle.com

**By U.S. Mail:** In addition to the parties of record receiving notice through the CM/ECF system, the following parties should be served notice pursuant to Fed. R. Civ. P. 5(b).

None