**This order is SIGNED.**

**Dated: August 30, 2019**



**WILLIAM T. THURMAN**
**U.S. Bankruptcy Judge**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF UTAH

In re: BLACK IRON, LLC,

        Debtor,

WELLS FARGO RAIL CORPORATION
f/k/a FIRST UNION RAIL
CORPORATION and HELM PACIFIC
LEASING,

        Plaintiffs.

Vs.

BLACK IRON, LLC; CML METALS
CORPORATION; PIC RAILROAD, INC.
d/b/a CML RAILROAD, INC.; and
GILBERT DEVELOPMENT
CORPORATION,

        Defendants.

Bankruptcy No. 17-24816

Chapter 11

Adv. Pro. No. 17-2094

(consolidated with Adv. Pro. No. 17-2088)

Hon. William T. Thurman

## MEMORANDUM DECISION AFTER TRIAL

This action came before the Court for a bench trial on June 24 and concluded on July 2, 2019 (the "Trial"). At the Trial, Plaintiffs Wells Fargo Rail Corporation f/k/a First Union Rail Corporation ("Wells Fargo Rail") and Helm-Pacific Leasing ("Helm-Pacific," and together with Wells Fargo Rail, "Plaintiffs" or "WFRC") were represented by Matthew L. Lalli, Troy J. Aramburu, and Bret R. Evans of Snell & Wilmer L.L.P. Defendant Black Iron, LLC ("Black Iron") was represented by David J. Jordan, Mark E. Hindley, Ellen E. Ostrow of Stoel Rives L.L.P., and Dana R. Farmer of Durham Jones & Pinegar, P.C. Defendant Gilbert Development Corporation ("GDC") was represented by Dana R. Farmer. Defendants CML Metals Corporation ("CML Metals") and PIC Railroad, Inc. dba CML Railroad, Inc. ("CML Railroad") did not participate in the Trial.

After receiving evidence and hearing the arguments of counsel, along with considering the briefs and other court documents submitted by the parties, the Court now enters the following findings of fact and conclusions of law. The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, which are made applicable to this proceeding under Rule 7052 of the Federal Rules of Bankruptcy Procedure (the "Decision"). To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such. The Court has also made determinations regarding this matter in its Memorandum Decision on Defendants/Third-Party Plaintiffs' Motion for Summary Judgment on Black Iron, LLC's Claims and Memorandum in Support [Dkt. No. 80, Case No. 17-2088] and its Memorandum Decision on Plaintiffs' Motion for Summary Judgment on Only the Plaintiffs' Conversion Claim Against Black Iron, LLC and Memorandum in Support [Dkt. No. 441], which are incorporated herein by this reference.

2

## I.      JURISDICTION AND VENUE

The jurisdiction of the Court is properly invoked under 28 U.S.C. §§ 157(b) and 1334. Plaintiffs' claims against Black Iron are core proceedings pursuant to 28 U.S.C. § 157(b), and Plaintiffs' remaining claims are proceedings that may be heard and determined by this Court pursuant to 28 U.S.C. § 157(c). The parties had filed multiple lawsuits in state court and district court. On Aug. 21, 2017, Judge Jill Parrish of the United States District Court for the District of Utah (the "District Court") referred such claims to this Court[1] and the parties have consented to the jurisdiction of the Court to determine the claims and defenses asserted in the above-captioned adversary proceeding. This referral included all contract claims and state law claims in the previously-filed lawsuits. The jurisdiction of this Court is not disputed, and is hereby determined to be present.

Venue is determined by the Court to be proper pursuant to the provisions of 28 U.S.C. § 1409. Venue is laid in the United States Bankruptcy Court for the District of Utah.

## II.     CONSOLIDATION

On October 13, 2017, this Court entered in this adversary proceeding its Order Memorializing Status and Scheduling Conference Dates and Deadlines in Consolidated Adversary Proceedings (the "First Scheduling Order"). Pursuant to the First Scheduling Order, the Court has consolidated for purposes of discovery and trial this adversary proceeding (Case No. 17-2094) with another proceeding pending before the Court involving similar parties (Case No. 17-2088).

---

[1] *See* Order Referring Case to Bankruptcy Court [Dkt. No. 117, Case No. 2:15-cv-00152-JNP] dated August 14, 2017, by which the District Court referred to the bankruptcy court that action styled *CML Metals Corp.* et al. *v. Wells Fargo Rail Corp.,* et al. (Case No. 2:15-cv-152-JNP-DBP) that had been pending before the District Court.

III.   SUMMARY

Beginning in June 2010, Helm Financial Corporation, WFRC's predecessor-in-interest, and Helm-Pacific, as lessors, entered into four leases and related guarantees (the "Leases") with CML Metals and CML Railroad for the use of 540 railcars and 4 locomotives (the "Railroad Equipment"). CML Metals owned an iron ore mine near Cedar City, Utah (the "Mine"), which included the water rights, mineral rights, and a short line railroad. CML Metals used the Railroad Equipment in its mining operations on the real property then-owned by CML Metals (the "Property"). In 2012, CML Metals constructed a concentrate plant, or mill (the "Mill"), that included various other pieces of equipment including separators and filters. The Mill was situated on the Mine property. GDC operated the Mine pursuant to a contract with CML Metals.

The Railroad Equipment was used to transport iron ore from the Mine to California, which was then shipped to China. In October 2014, CML Metals suspended mining operations and stopped making payments to WFRC under the Leases. WFRC declared a default under the Leases. CML Metals requested that WFRC forbear from exercising its remedies under the Leases, and the parties began forbearance negotiations at that time.

Before the Mine ceased operations, CML Metals began looking for a buyer for the Mine. After months of marketing did not result in a sale, CML Metals negotiated an Asset Purchase Agreement (the "APA") with GDC, which was signed on April 2, 2015. Shortly before closing on the sale, GDC assigned most of its interest in the APA to a newly created entity, Black Iron. Black Iron is a debtor and debtor-in-possession in the above-captioned chapter 11 bankruptcy case. Black Iron is a Utah limited liability company, with a principal place of business in Iron County, Utah. The transaction closed on May 5, 2015 (the "Closing"). The Railroad Equipment remained on CML Metals' Property at the Closing. WFRC made efforts to retrieve its Railroad

4

Equipment, but was unable to do so. Three years later, after petitioning this Court for a writ of replevin, WFRC was able to sell the Railroad Equipment to a third party.

WFRC claims that CML Metals owes damages for failing to make payments under the Leases, and for other amounts owed to WFRC under the Leases. WFRC also alleges that the transfer in which CML Metals transferred substantially all of its assets to GDC, and thence to Black Iron, is a transfer that is voidable under the Uniform Fraudulent Transfer Act ("UFTA").[2]

WFRC further alleges that Black Iron converted the Railroad Equipment when it prevented WFRC from retrieving the Railroad Equipment. The Court found on summary judgment that Black Iron converted the Railroad Equipment [Dkt. No. 441] and reserved determination of damages for trial. Black Iron asserted claims and damages against WFRC for storage fees and trespass. The Court dismissed those claims on summary judgment [Dkt. No. 80, Case No. 17-2088].

The trial thus focused on the fraudulent transfer claims under the UFTA, the damages under the Leases, the amount of the claim WFRC may have under the UFTA, and the damages that WFRC incurred as a result of the conversion of its Railroad Equipment. The Court finds that the transaction was done with the intent to hinder or delay the creditor, WFRC, and determines the amount of the claim that WFRC may recover under the UFTA. The Court also determines the amount of conversion damages to be imposed against Black Iron.

The issues in this proceeding are state law issues. In a typical fraudulent transfer proceeding brought under the Bankruptcy Code, a debtor or trustee would be asserting that the

---

[2] The Uniform Fraudulent Transfer Act was renamed the Uniform Voidable Transactions Act and renumbered in 2017. Because the transaction at issue in this case took place in 2015, the Court will use the statutory name and numbering in effect in 2015.

5

debtor fraudulently transferred property to a creditor, and the action would attempt to bring the transferred property or its equivalent value back into the bankruptcy estate. In this proceeding, the debtor is the alleged recipient of a fraudulent transfer. The creditor, WFRC, has not made a claim to take any property out of the bankruptcy estate, but rather seeks to establish a claim that will be paid by Black Iron through either a chapter 11 plan or a liquidation. No plan has yet been filed by Black Iron. No party has made any motions or claims that a plan should be filed or that Black Iron should be liquidated by a trustee in a chapter 11 or 7, nor has any party made any motion to lift the automatic stay.

## IV.   FACTS

### A. Corporate Structure and Mine Ownership

A detailed analysis of the corporate structure, various leases involved, the mining operations and transactions among the parties is needed to put this ruling in context. The Court believes that detailing this in narrative form will assist in understanding the entire Decision.

In 2005, Palladon Iron Corporation ("Palladon"), the predecessor in interest to CML Metals, purchased an iron ore mine known as the Comstock Mountain Lion Mine, which is the Mine already referred to, out of the case commonly referred to as the Geneva Steel Bankruptcy Case for $10 million. Michael Conboy ("Conboy") was involved with the transaction through Palladon when it purchased an ownership interest in the Mine in 2005, and then he became Chairman of the Board of CML Metals after it was formed in 2010. CML Metals was a corporation existing under the laws of the State of Utah, which is now an expired corporation. Conboy was the Chairman of the Board of Directors of CML Metals, and also held another seat on CML Metals' board of directors as a designee of Luxor Capital, one of the chief investors in CML Metals. CML Holdings, Inc., ("CML Holdings") was the sole owner of CML Metals.

6

CML Railroad is a corporation organized and existing under the laws of the State of Utah, with its principal place of business in Iron County, Utah. CML Railroad operated the "short line tracks" which are the railroad tracks that run from the Mill (built in 2012) to the Union Pacific tracks. Ore was transported from the Mine on the short line tracks to the Union Pacific interchange and from there, the ore was transported to an ocean port for final transportation.

GDC is a Nevada corporation, with places of business in Iron and Washington Counties, Utah. GDC had been the contract mine operator at the Mine since at least 1983 for previous owners. Mr. Steve Gilbert ("Steve") is the chief principal of GDC, and owns at least 80% of GDC's stock. His son, Dale Gilbert, ("Dale") was also involved in the mining business, as was Dale's son, Keith Gilbert ("Keith"). While the Court would ordinarily refer to a party by last name, the Court will refer to these individuals by first name to avoid confusion in this case.

In 2008, Palladon solicited bids from several mining companies to operate the Mine. While GDC did not make the lowest bid, the decisionmakers at Palladon selected GDC due to its extensive knowledge of the Mine (having been the previous mining contractor) and its offer to provide additional services. [Trial Ex. 302.] On June 1, 2008, GDC and Palladon (CML Metals' predecessor) entered into a five-year agreement under which GDC agreed to provide mining services to CML Metals. [Trial Ex. 13.] The mining contractors' duties were essentially to blast the rock from the mountain and load it onto the railcars. This 2008 Mining Contract was amended and restated on Aug. 5, 2010 for a renewed five-year term. [Trial Ex. 27.]

When Palladon first purchased the Mine in 2010, it was shipping the mined iron ore product without any processing. At that time, iron ore prices were high enough that shipping unprocessed iron ore could be done profitably. When the price of iron ore dropped in 2008 after

7

the global financial crisis, this business model was no longer profitable. In 2012, CML Metals financed construction of the Mill in order to remove waste material and moisture in order to increase the percentage of iron ore before the iron ore was shipped, in an effort to increase the Mine's efficiency and profitability. The Mill construction cost was between $70 million and $90 million. [Conboy Dep. 36:6-37:1, 38:2-15, 43:8-20.]

After the Mill was built in 2012, GDC's duties as mining contractor expanded to include bringing the raw rock product to the Mill. Once the raw product was processed, the iron ore concentrate was added to the stockpile and eventually loaded onto railcars. The waste was dumped in the tailings area. The terms of the mining contract were amended to reflect the additional duties, per an addendum dated July 26, 2011. [Trial Ex. 40.]

CML Metals needed a management team, and reached out to Dale sometime in 2010, who, at the time, was President of GDC. Dale joined CML Metals as its president to handle the logistical details of shipping the iron ore by rail to the port in California and ship it to China by sea. [Conboy Dep. 56:21-60:12.] For a time, GDC and CML Metals shared office space. [*See, e.g.,* Trial Ex. 27.]

### B. The Leases for the Railcars and Locomotives

The original lessors of the leases that are at issue in this matter were Helm Financial Corporation and Helm-Pacific. Helm-Pacific is a Nebraska general partnership with its principal place of business located in Cook County, Illinois. Helm Financial Corporation merged with and into First Union Rail on or about August 1, 2015. First Union Rail changed its name to WFRC on or about February 17, 2016. WFRC is a corporation organized and existing under the laws of the State of North Carolina, with a place of business in Cook County, Illinois. WFRC and Helm-

8

Pacific, the Plaintiffs in this proceeding, thus hold the Lessor interests in the Leases. WFRC is

engaged in the business of leasing railroad equipment and does not operate railroads.

There are four leases at issue in this case. On or about June 25, 2010, CML Metals and

Helm-Pacific entered into a Net Lease Agreement ("Hopper Lease #1"). [Trial Ex. 25.] One

hundred and forty-eight (148) railcars were subject to Hopper Lease #1. The lease rate was $305

per railcar per month, with a termination date of July 31, 2015.

On or about February 11, 2011, Helm Financial and CML Metals entered into another

Net Lease Agreement ("Hopper Lease #2"). [Trial Ex. 34.] Two hundred eighty-eight railcars

(288) were subject to Hopper Lease #2. The lease rate was $350 per railcar per month for a term

of 60 months, which would have ended on February 11, 2016.

On or about December 8, 2011, Helm Financial and CML Railroad entered into a

Locomotive Lease Agreement for the lease of four locomotives ("Locomotive Lease"). [Trial Ex.

42.] CML Metals executed an Unconditional Continuing Guaranty related to the Locomotive

Lease Agreement on or about December 8, 2011 ("Locomotive Lease Guaranty"). [Trial Ex. 43.]

The lease payments for the locomotives increased each year. For the twelve months beginning on

the Rent Commencement Date (as defined in the Locomotive Lease), the lease payment was

$215 per locomotive per day. That lease payment increased to $225 per day for months 13

through 24, and then increased to $235 per locomotive per day from month 24 through the

expiration of the lease term, which was Dec. 31, 2015.

On or about January 31, 2012, Helm Financial and CML Railroad entered into a third Net

Lease Agreement ("Hopper Lease #3") with an end date of April 30, 2014. [Trial Ex. 44.] The

lease rate was $350 per railcar per month. The term was extended through July 31, 2015. [Trial

Ex. 95.] One hundred and three (103) railcars were subject to Hopper Lease #3. The lease rate

was $350 per railcar per month, though this monthly rental rate was later changed to $305 per railcar per month following April 30, 2014. [Trial Ex 95.] On or about January 31, 2012, CML Metals executed an Unconditional Continuing Guaranty related to this Hopper Lease #3 dated January 31, 2012. [Trial Ex. 45.]

Between June 2010 and October 2014, CML Metals used the Railroad Equipment in its mining operations and operated the Railroad Equipment on CML Metals' Property.

## 1. Lease Default

CML Metals began experiencing financial difficulties in late 2013 and continuing into 2014, when the price of iron ore began declining. On January 1, 2014, the price of 62% Fe grade iron ore (Fe is the symbol for the chemical element iron; iron ore is graded according to how much or what percentage of useable iron ore is in a ton) was $135 per ton; by November 2014, the price declined to approximately $72 per ton. [Trial Ex. 121; Trial Ex. 313.]

The Mine ceased mining operations in mid-October 2014. [Trial Ex. 112.] CML Metals did not make the Lease payments that were due on Nov. 1, 2014. When those payments were missed, WFRC sent letters of default to CML Metals (the "Default Letters") [Trial Exs. 116, 117, 118, 119.] WFRC identified two Events of Default under the Leases: the non-payment of rent, and the statement that CML Metals may cease doing business as a going concern. In each of the Default Letters, WFRC demanded immediate payment of the amounts owing under the Leases, and assurance that CML Metals intended to operate as a going concern.

## 2. Forbearance Negotiations and Marketing the Mine

In December 2013, CML Metals engaged Sagent Advisors, LLC ("Sagent") to market the Mine to potential purchasers. [Trial Ex. 64.] When CML Metals replied to the Default Letters, it asked WFRC to forbear from exercising available remedies to allow CML Metals an opportunity

10

to be sold as a going concern. CML Metals represented that it would "continue to pursue sub-leasing opportunities," that "multiple strategic suitors [were] completing their final diligence and negotiation of financial terms," and that forbearance "represents the most efficient path for [WFRC] to not only be made whole on its debts under the lease obligations, but also provides for an expedient transfer of CML to a buyer that will invest in the project and again utilize [WFRC's] services." CML Metals also represented that it had "gone into cash conservation mode" and that "a legal claim at this stage against CML will materially damage the sales process." [Trial Ex. 121.]

WFRC began negotiating a forbearance agreement with CML Metals, and did not immediately pursue other remedies for default under the Leases, although the Default Letters all reserved the right to pursue other remedies against CML Metals. [Trial Ex. 123.] As part of its forbearance communications with WFRC in late 2014, CML Metals produced financial statements representing that the net value of its assets totaled approximately $220 million and that its properties, plant, equipment, and mineral reserves were valued by CML Metals at approximately $189 million as of February 2014. [Trial Ex. 132.] Mr. Chris Bradley, who worked as CML Metals' Vice President of Finance during the relevant time periods, testified that the information provided to WFRC about the sales negotiations was based on an honest belief that Evraz (a Russian based company) would make a firm offer and CML Metals would be sold. During this same time, CML Metals was negotiating with other vendors, such as GDC, for reduced or delayed payments. Mr. Bradley stated that CML Metals did not have the funds to make the Lease payments.

By late February 2015, term sheets and multiple drafts of the forbearance agreement had been exchanged between CML Metals and WFRC. [See, e.g., Trial Ex. 135.] In a discussion

11

about the terms of the forbearance, WFRC requested a lump sum payment while CML Metals wanted to make monthly payments. [Trial Ex. 135.] WFRC also wanted additional security and guarantees, which CML Metals was reluctant to provide. [Trial Ex. 155.] CML Metals was not in a hurry to sign a forbearance agreement, and contemporaneous emails show intentions to "push [WFRC] out" a few more months, and to "[D]rag your heels on this" in reference to the forbearance negotiations with WFRC. [Trial Exs. 141, 135.]

When WFRC demanded that CML Metals execute the forbearance agreement, CML Metals sued WFRC in March 2015 in state court. [Trial Ex. 209; Dkt. No. 3.] On May 5, 2015, WFRC filed a counterclaim against CML Metals and a Third-Party Claim against CML Railroad demanding, among other things, the return of the Railroad Equipment. [Dkt. No. 13.]

### C. Marketing the Mine

By letter dated December 20, 2013, many months before the Mine shut down, CML Metals engaged an investment banking firm, Sagent, to market the Mine to potential buyers. [Trial Ex. 64.] The marketing efforts preceded, and then overlapped with, the time period in which the Leases were in default. Sagent contacted numerous potential purchasers, drafted an informational memorandum describing the facts about the Mine in glowing terms for the use of potential purchasers [Trial Exs. 82, 113], and negotiated with the three parties who showed an interest in pursuing a purchase. Interested parties were given tours, allowed to conduct their own inspections of the mine, including drilling, and management was made available to answer questions. [See, e.g., Trial Exs. 80; 88; 129.]

On April 1, 2014, CML Metals received a non-binding proposal from Evraz to potentially acquire CML Metals' assets for $120 million following an exclusive due diligence period. Conboy stated that the offer was "very disappointing." [Trial Ex. 81.] Despite this assessment,

12

there was no evidence presented that any individual sought to discourage the purchase, and

Evraz's investigation of CML Metals proceeded without hindrance. However, after the due

diligence period, Evraz withdrew its proposal in March 2015. [Trial Ex. 154]. The other parties

who had expressed some interest in the Mine did not make written offers. Ultimately, Sagent was

not able to find a purchaser for the Mine.

After Evraz withdrew its offer, Conboy was still highly motivated to sell the Mine. Black

Iron stated that Sagent contacted all interested parties after Evraz withdrew its offer and offered

the Mine for sale for $15 million dollars. This is apparently based on an email sent from Conboy

to Cyndi Gilbert, who is Steve's wife and also legal counsel for GDC, in which Conboy stated

that, "Our advisor [Sagent] has reached out to everyone we spoke to and told them the mine is

for sale at a bargain price. At this point we would accept $15mm for the mine. If Steve is

interested he should let me know. He could pay $10mm and forgive his $5mm and be in the

same spot." [Trial Ex. 159.] Black Iron did not present any evidence that Sagent had actually

contacted anyone with the offering price of $15 million. Paul Scherzer, an employee of Sagent

who was involved in marketing the Mine, stated that he did not recall telling potential purchasers

that CML Metals was willing to sell the Mine for $15 million. [Scherzer Dep. 180:3-22.] There

is not enough evidence for the Court to find that the Mine was specifically marketed with an

offering price of $15 million to anyone except Steve.

### D. Negotiating the Asset Transfer between CML Metals, GDC and Black Iron

Sagent's marketing contract was signed on Dec. 20, 2013 and did not have a specific end

date. Instead, it could be terminated upon 10 days written notice. [Trial Ex. 64.] No termination

notice was presented to the Court. However, it is undisputed that Sagent did not receive a

commission when the Mine assets were transferred to Black Iron, so the Court assumes that

13

Sagent's contract terminated before April 2, 2015, which is the date the APA was signed. In addition, Paul Scherzer did not recall any involvement in the discussions between GDC and CML Metals regarding the purchase of the Mine, other than perhaps providing some information to Steve. [Scherzer Dep. 177:6-25; 180:23-181:7; 187:10-21; Trial Ex. 159.]

Within weeks of Evraz withdrawing its interest in the Mine, Conboy and Steve began discussing a sale of substantially all of the Mine's assets from CML Metals to GDC. Steve recorded many of these phone calls, and the recordings were produced in discovery. The transcripts and recordings were admitted as exhibits at trial. The Court quotes from this evidence to establish the factors in the negotiations and the parties' intentions.

In a March 21, 2015 telephone conversation between Conboy and Steve, they discussed the sales price for the assets, and then discussed which debts of CML Metals would be paid:

> MR. GILBERT: What is the price with knowing – I don't want your management team down there, but if I was to buy it, personally, Steve Gilbert, what would be your . . . bottom line today for cash and what am I getting?
>
> MR. CONBOY: I need $15 million dollars and that's – because that clears all the debts. If it's less than that – I've got to file bankruptcy anyway so it doesn't matter. So it's $15 million dollars and that – I'm going to owe you in August, like whatever that is, for $4.8 or something. So for you it would be, you know $10.2 million unless you can just write off your own debt. So that's -- for you it's less. You know, if you're willing to write off your own debt it's less but I'm just going to turn around and take that $15 and pay you anyway.
>
> . . .
>
> MR. GILBERT: What – what am I getting – Mike, I've got the money. But I'm just trying –
>
> . . .
>
> MR. CONBOY: It's an – it's an asset purchase so it would just be all the – all the assets of the mine. So we're not selling the stock because we've got to – no one else wants to – no one else wants to step into our potential liability with First Union [WFRC] or a potential liability with Trafigura. So just buy the mine. It's just the assets, an asset purchase. Everything else, my problem.
>
> [Trial Exs. 160, 161 (BI007003), 4:3-18; 5:3-13.]

14

On April 2, 2015, CML Metals and CML Holdings, through their chairman Conboy, entered into the APA with GDC, through its president Steve, to transfer all of CML Metals' assets which were not excluded by the terms of the APA (the "Assets"). Conboy and Steve had discussed whether or not the Assets would be transferred to GDC or to a separate corporate entity. This question was apparently not settled by the time the APA was signed, and so the APA stated that "CML will convey the assets to GDC or, at GDC's direction, GDC's nominee." [Trial Ex. 183 at Section 101(a).] The APA conveyed all of the property related to CML Metals' Mine, except for the excluded property listed on Schedule 1.01(a). The only Assets that were excluded from the transfer were the proceeds of a named lawsuit, and causes of action against Samuels Engineering and First Union Rail [WFRC]. GDC assumed the liabilities listed on Schedule 1.02, which included: (1) any environmental liability; (2) tax obligations to the Iron County Treasurer estimated at about $851,168.32; (3) the amount of $2,902,900.06 owed to Michael Conboy and evidenced by a promissory note; (4) a retainer agreement with a law firm; and (5) all liabilities relating to the assets that accrued or became fixed after the closing date. [Trial Ex. 183 at Schedule 1.02.]

On April 14, 2015, Black Iron was formed as a Utah limited liability company. On April 29, 2015, GDC and Black Iron entered into an Assignment of Agreement Rights Under Asset Purchase Agreement (the "Assignment"). [Trial Ex. 194.] GDC assigned all of its rights under the APA to Black Iron. However, GDC remained obligated on the Assumed Liabilities listed on Schedule 1.02 of the APA. On May 5, 2015, the transaction for the transfer of CML Metals' Assets closed, and CML Metals transferred substantially all of its assets to Black Iron. [Trial Ex. 203.] The Court will refer to this entire sequence of events as the "Transfer."

15

At the Closing, the title company was instructed to disburse payments to various creditors, including $1.7 million to Union Pacific, $1.7 million to SA Recycling, and smaller amounts to various vendors and creditors. No amounts were paid to WFRC at the Closing. [Trial Ex. 203.]

CML Metals did not return the Railroad Equipment to WFRC before the Transfer, and the Railroad Equipment remained on the Property.

### E. Conversion of the Railroad Equipment

WFRC brought claims for relief on grounds of conversion against Black Iron, alleging that Black Iron prevented WFRC from retrieving its Railroad Equipment. The Court memorialized its determinations with respect to WFRC's conversion claims in its Memorandum Decision on Plaintiffs' Motion for Summary Judgment on only the Plaintiffs' Conversion Claim Against Black Iron, LLC and Memorandum in Support [Dkt. No. 441] (the "Memorandum Decision on Conversion"), in which it ruled in WFRC's favor on the conversion issue on summary judgment, but reserved the issue of damages for this Trial. A summary of the facts pertinent to the determination of conversion damages will be given in Section VII.B. of this Decision.

### V. RULE 7052 MOTION

At the close of WFRC's case, Black Iron and GDC moved for judgment on partial findings pursuant to Fed. R. Civ. P. 52 and Fed. R. Bankr. P. 7052. Under Rule 52(c), "[i]f a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue, the court may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue."

16

Black Iron asserted in its motion that WFRC had failed to prove (1) that it was entitled to late fees assessed at 200% of the Rent due under the Leases; (2) that the Transfer was fraudulent under Utah Code Ann. § 25-6-5(a)(1); (3) that Black Iron and/or GDC were insiders of CML Metals or the Transfer was for an antecedent debt; (4) that GDC was a transferee or beneficiary of the Transfer; (5) and the amount of the damages for conversion of the Railroad Equipment.

The Court took the matter under advisement, and then elected to exercise its discretion under Rule 7052(c) to "decline to render any judgment until the close of the evidence." Accordingly, the Trial continued and the Court continued to hear evidence. The matters submitted under Rule 7052 were thus decided upon a full review of the evidence and testimony presented by both parties.

## VI. CLAIMS UNDER THE UNIFORM FRAUDULENT TRANSFER ACT

WFRC has asserted that the Transfer was a fraudulent transfer within the meaning of the Uniform Fraudulent Transfer Act, codified at Utah Code Ann. § 25-6-1 et seq. In 2017, the statute was renamed the Uniform Voidable Transactions Act, renumbered to Utah Code Ann. § 25-6-101 et seq. and amended in several places. The Court will use the statute as it was in effect in 2015, the year the Transfer. There are multiple components to the pertinent Utah statute that need analysis.

### A. Utah Code Ann. § 25-6-5

WFRC requests a determination that the Transfer was a fraudulent transfer under Utah Code Ann. § 25-6-5, which stated:

(1) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
    (a) with actual intent to hinder, delay, or defraud any creditor of the debtor; or
    (b) without receiving a reasonably equivalent value in exchange for the transfer or

17

obligation; and the debtor:

(i) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

(ii) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

### 1. Did WFRC have a claim that arose before the Transfer?

The first question the Court must address is whether or not WFRC has a claim that arose before the Transfer. The UFTA defines a "claim" broadly as "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." Utah Code Ann. § 25-6-2(3). A "creditor" is "a person who has a claim." Utah Code Ann. § 25-6-2(4). Beginning in November 2014, CML Metals breached its Leases and Guaranties with WFRC. WFRC therefore had a right to payment from CML Metals. Because WFRC had a right to payment from CML Metals, that is, a claim against CML Metals, WFRC was CML Metals' creditor. WFRC's claim therefore arose before the Transfer.

### 2. Was there actual intent to hinder, delay or defraud any creditor of the debtor?

To determine 'actual intent' under Utah Code Ann. § 25-6-5(1)(a), the Court may consider several non-exclusive factors listed in the statute, which are whether:

(a) the transfer or obligation was to an insider;
(b) the debtor retained possession or control of the property transferred after the transfer;
(c) the transfer or obligation was disclosed or concealed;
(d) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
(e) the transfer was of substantially all the debtor's assets;
(f) the debtor absconded;
(g) the debtor removed or concealed assets;
(h) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(i) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(j) the transfer occurred shortly before or shortly after a substantial debt was incurred; and

(k) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

Only subparagraphs (a) and (h) are disputed by the parties. The Court's findings on the remaining factors may be summarized as follows:

Utah Code Ann. § 25-6-5(2)(b): CML Metals did not retain possession or control of the assets after the Transfer.

Utah Code Ann. § 25-6-5(2)(c): WFRC was not aware that GDC and CML Metals were negotiating the Transfer until the Closing had already taken place. However, WFRC was aware that CML Metals was searching for a buyer.

Utah Code Ann. § 25-6-5(2)(d): CML Metals sued WFRC, and WFRC filed suit against CML Metals approximately a month before the Transfer.

Utah Code Ann. § 25-6-5(2)(e): The Transfer was of substantially all of CML Metals' assets.

Utah Code Ann. § 25-6-5(2)(f): CML Metals did not abscond.

Utah Code Ann. § 25-6-5(2)(g): CML Metals did not remove or conceal assets.

Utah Code Ann. § 25-6-5(2)(i): CML Metals was insolvent at the time of the Transfer.

Utah Code Ann. § 25-6-5(2)(j): The Transfer occurred shortly after CML Metals incurred a substantial debt to WFRC; and

Utah Code Ann. § 25-6-5(2)(k): CML Metals did not transfer the essential assets of the business to a lienor who transferred the assets to an insider of CML Metals.

Whether or not the parties were insiders, and whether or not the transferor received reasonably equivalent value for the assets, will now be addressed.

### a. Insider status

The parties dispute whether or not GDC or Black Iron were insiders of CML Metals. GDC operated the Mine under a contract with CML Metals. When the mining contract was amended, restated and extended in 2010, Dale left GDC and joined CML Metals as its president. Dale remained as president of CML Metals at least until the transfer of the Assets to Black Iron via GDC's Assignment. After Dale left GDC and joined CML Metals in 2010, he remained a shareholder in GDC through at least May 2015 when the Transfer took place. CML Metals

transferred substantially all of its assets to GDC and GDC's newly-created affiliate and nominee Black Iron, an entity that was primarily owned and controlled by Dale's father, Steve.

The UFTA defines 'insider' in relation to the debtor, which in this case is CML Metals. As CML Metals is a corporation, an 'insider' includes "a relative of a general partner, director, officer, or person in control of the debtor." Utah Code Ann. § 25-6-2(8)(b)(vii). Steve is an insider of CML Metals because he was the father of CML Metals' president, Dale, at the time of the Transfer. Dale was also a shareholder in GDC at the time of the Transfer. Black Iron and GDC urge the Court to ignore this relationship and specific definition under the Utah code and not find an insider relationship.

Although Steve and Mr. Bradley testified that Dale was not included in any of the negotiations leading up to the Transfer, he did have some involvement, based on an email referencing discussions with Dale regarding the Transfer [Trial Ex. 190]. Further, Dale was engaged as a consultant by CML Holdings to assist in the transition of the business to GDC. [Trial Ex. 192.]  The Court notes that the definition of 'insider' is based on relationships, not the actions of the parties. Regardless of whether or not Dale was excluded from the negotiations regarding the Transfer, Steve is still an 'insider' of CML Metals by virtue of being Dale's father. There is nothing derogatory about being an insider. All businesses have insiders. The status simply requires a heightened scrutiny of certain transactions.

A statutory insider also includes "an affiliate, or an insider of an affiliate as if the affiliate were the debtor." Utah Code Ann. § 25-6-2(7)(e). An affiliate includes "a person who operates the debtor's business under a lease or other agreement . . . ." Utah Code Ann. § 25-6-2(1)(c). GDC operated the Mine for CML Metals, and is thus an affiliate and insider of CML Metals. Steve is an affiliate of GDC because he owns and controls 20% or more of the outstanding

20

voting securities of GDC. Utah Code Ann. § 25-6-2(1)(a). Steve is also an affiliate of Black Iron

because his ownership and control of Black Iron makes him an insider of Black Iron. *Id*.

GDC and Black Iron are thus statutory insiders of CML Metals as affiliates, and due to

the control Steve exercised over these entities. Black Iron argues that the analysis of insider

status should be confined to the business entities involved, and that Steve's status as an insider of

CML Metals should not be imputed to GDC or Black Iron. The Court disagrees. Transferees

should not be able to escape fraudulent transfer liability merely by incorporating and then

directing that the assets be transferred to wholly controlled incorporated entities, as discussed in

the following cases which are persuasive to the Court. *See Matter of Galaz*, 850 F.3d 800, 803,

805 (5th Cir. 2017) (concluding that a transfer of assets to an LLC wholly owned by the debtor's

father was a transfer to an insider); *see also In re Fortune Nat. Res. Corp.*, 350 B.R. 693, 696

(Bankr. E.D. La. 2006) ("Certainly Congress' reasons for requiring heightened scrutiny for

certain individuals apply with equal force to entities entirely controlled by such individuals.");

*SE Prop. Holdings, LLC v. Center*, 2017 WL 3403793, at *20 (S.D. Ala. Aug. 8, 2017)

(concluding that an LLC controlled by the debtor's family members was an insider). "To hold

otherwise would be to eviscerate this section of the [UFTA] by inviting insiders to escape

judicial scrutiny simply by incorporating themselves." *In re Fortune*, 350 B.R. at 696.

(concluding that where an individual "is without question an insider of the debtor, it would be

both folly and a triumph of form over substance to hold that the LLC over which [the individual]

exerts complete control is not an insider.").

Accordingly, the Court finds and concludes that Steve, as an individual, was an insider of

CML Metals by virtue of his family relationship with Dale, the president of CML Metals. The

Court also finds and concludes that GDC was an affiliate, and therefore an insider of CML

Metals based on the Mining Contract. Black Iron was an affiliate, and therefore an insider, because it is owned and controlled by Steve, who is an insider of CML Metals.

Inasmuch as the Court has found that specific parties and entities are statutory insiders, it is not necessary to analyze whether the parties and entities are also non-statutory insiders.

### b. Hinder or delay

Also under Utah Code Ann. § 25-6-5(1), the Court must make a determination of whether the debtor had the actual intent to hinder, delay or defraud any creditor. Fraud is not a necessary prerequisite for a finding that a transaction was fraudulent. An intent to hinder or delay a creditor is sufficient. This distinction is important because while fraud requires an intention to deceive a party, hindrance or delay simply require an intention to put off payment.[3] In considering whether or not CML Metals intended to hinder or delay WFRC, the Court has considered the evidence presented at trial in the form of emails, recorded telephone calls and the testimony and depositions of the parties.

The forbearance negotiations themselves were a way to delay payment to WFRC. The Court finds that CML Metals initially undertook the forbearance negotiations with a reasonable belief that the Mine would sell, but asking a creditor to forbear in exercising its remedies is, by definition, an intent to delay collection activities by a creditor. Forbearance negotiations began in

---

[3] *See* Uniform Voidable Transactions Act § 4 cmt. 8 (Nat'l Conference of Comm'rs on Unif. State Laws, 2016) ("Fraud is not a necessary element of a claim for relief under any of those provisions. By its terms, § 4(a)(1) applies to a transaction that 'hinders' or 'delays' a creditor, even if it does not 'defraud' the creditor. *See, e.g., Shapiro v. Wilgus*, 287 U.S. 348, 354 (1932); *Means v. Dowd*, 128 U.S. 273, 288-89 (1888); *Consove v. Cohen (In re Roco Corp.)*, 701 F.2d 978, 984 (1st Cir. 1983); *Empire Lighting Fixture Co. v. Practical Lighting Fixture Co.*, 20 F.2d 295, 297 (2d Cir. 1927); *Lippe v. Bairnco Corp.*, 249 F. Supp. 2d 357, 374 (S.D.N.Y. 2003). "Hinder, delay, or defraud" is best considered to be a single term of art describing a transaction that unacceptably contravenes norms of creditors' rights. Such a transaction need not bear any resemblance to common-law fraud."); *see also Selvage v. J.J. Johnson & Assocs.*, 910 P.2d 1252, 1262 (Utah Ct. App. 1996) (referencing the separate standards of proof needed to prove fraud as compared with proving hindrance and delay).

November 2014, and were still ongoing four months later without an agreement. Emails submitted into evidence, dated January and February 2015 [Trial Exs. 135, 141] contained instructions to "drag your heels" and try to "push [WFRC] out" a few more months. This evidence indicates an intention to delay payment to WFRC, whether that payment was to be made pursuant to a forbearance agreement or the Leases. It also indicates that the reasonable belief that CML Metals could be sold was waning.

Black Iron argued that the intent to hinder or delay relates to only the Transfer itself, and that CML Metals' intention to delay throughout the forbearance negotiations should be separated from any intention CML Metals may have had when making the Transfer itself. For this analysis, Black Iron relies on the wording of the statute which states that a transfer is fraudulent "if the debtor made the transfer . . . (a) with actual intent to hinder, delay, or defraud any creditor of the debtor." Utah Code Ann. § 25-6-5(1). Black Iron's argument would separate the transfer from the context surrounding it. The Court is not persuaded by this argument. CML Metals' purpose in asking for forbearance from WFRC was to stave off a lawsuit or other collection activity by WFRC while it sought a buyer for the Mine. The marketing and sale of the Mine was thus tied very closely to the forbearance negotiations.

In addition, the phone calls referred to above between Conboy and Steve discussed the payment of other creditors with the money from the Transfer, but excluded WFRC's obligation from payment. This excerpt from one of the phone calls between Steve and Conboy discussed the obligation to WFRC, which was under dispute in a lawsuit at the time:

> MR. GILBERT: —that's under dispute in the lawsuit, correct?
>
> MR. CONBOY: No, no, no, no. We [CML Metals] would owe them [WFRC] that money. That's – that's – those are leases that we haven't – we still have lease payments going on in the future, so those are lease payments.

We're – we're – we're going to dispute it and say, well, you promised us other cars and maybe we win, maybe we don't, but we will owe them –

MR. GILBERT: That's going to be down the road?

MR. CONBOY: It'll be down the road, but I've got to have the plan to have the cash to pay them.

MR. GILBERT: Well, but if you – if they didn't give you the right cars and they didn't perform, then there's some, certainly, negotiating in good faith.

MR. CONBOY: There is but, you know, there's nothing contractually – there was no contract – nothing in the contract that said they were providing us those cars. Those were the conversations Dale had. So my view is we're going to owe them the money.

[Trial Exs. 166, 167 (BI0007006), 6:9–7:3.]

Later in that same conversation, Steve and Conboy further discussed CML Metals' debts, and it was decided that WFRC would not be paid out of the eventual purchase of the Assets by GDC:

MR. CONBOY: Well, how do I clear – how do I clear my debts then?

MR. GILBERT: Well, your debts right now are $3.4, that's real.

MR. CONBOY: They're – they're $4.6 – $4.6 plus First Union of $1.4. It'll be down the road, but I've got to have the plan to have the cash to pay them.

MR. GILBERT: Well, you can't throw in First Union, then, because they're going to stay with CML and they can – they can fight CML all they want; who gives a shit.

MR. CONBOY: Yeah, yeah.

[Trial Exs. 166, 167 (BI0007006), 14:2-11.]

Conboy stated that he would pay other creditors with the cash from the sale of the Mine, but payment to WFRC was contingent on the outcome of the lawsuits. [Trial Exs. 160, 6:7-15; 166, 5;10-7:3.] At the Closing, other creditors were paid out of the money which CML Metals received, but not WFRC. [Trial Ex. 203.] This result, combined with the evidence of intent to hinder or delay payment to a creditor, persuades the Court to conclude that CML Metals' intent during the forbearance negotiations, while negotiating the Transfer, and when making the Transfer itself, was to hinder and delay payments to WFRC on its claim.

24

### 3. Reasonably equivalent value

Besides a finding of actual intent to hinder or delay a creditor, a transfer may be deemed fraudulent under UFTA if the transfer was made without the transferor receiving reasonably equivalent value in exchange, and the debtor's financial situation is thereafter inadequate for the business, as described in Utah Code Ann. § 25-6-5(1)(b). Although the Court has found actual intent to hinder or delay, it will also address whether there was reasonably equivalent value exchanged.

"Determining whether [a creditor] provided 'reasonably equivalent value' under the UFTA requires a two-step analysis." *Klein v. Michelle Tuprin & Assocs.*, 2016 WL 3661226, at *7 (D. Utah July 5, 2016) (unpublished). First, the Court must consider whether the transferee "provided 'value' to [the debtor.]" *Id*. And if the transferee provided value, "the court must then consider whether this value was 'reasonably equivalent.'" *Id*. "[V]alue is given for a transfer or an obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied." *Id*. (quoting Utah Code Ann. § 25-6-4(1)). "In determining whether reasonably equivalent value was given, the focus is on whether the debtor received reasonably equivalent value from the transfer." *Miller v. Wulf*, 84 F. Supp. 3d 1266, 1276 (D. Utah 2015).

The Utah Supreme Court recognizes that "where the debtor . . . receive[s] reasonably equivalent value, the transfer puts one asset beyond the reach of the creditors, but replaces the asset with one of equivalent value, thus avoiding harm to the creditors." *Klein*, 2016 WL 3661226, at *7 (quoting *Rupp v. Moffo*, 358 P.3d 1060, 1064 (Utah 2015)). Thus, "[t]he primary consideration in analyzing the exchange for value for any transfer is the degree to which the transferee's net worth is preserved." *Id.* (alteration in original) (quoting *Klein v. Cornelius*, 786

25

F.3d 1310, 1321 (10th Cir. 2015)); *see also In re Indep. Clearing House Co.*, 77 B.R. 843, 859 (D. Utah 1987) (The court reasoned in a bankruptcy context that, "In theory, the trustee is not allowed to avoid transfers made for reasonably equivalent value because creditors are not hurt by such transfers. If the debtor no longer has the thing transferred, either he has its equivalent, in which case his creditors can reach the equivalent to satisfy their claim, or his liabilities have been proportionately reduced." (citation omitted)).

CML Metals received $13,784,346.91 for the Mine, in a combination of cash, debt forgiveness and assumed liabilities (the "Purchase Price"). [Trial Ex. 85.] GDC gave credit for approximately $2,988,746.03 in outstanding amounts which were owed by CML Metals for the standby charges, as well as costs for regular ore, lean ore, blasting costs, waste costs, tailings costs and royalty costs. [Trial Ex. 85.] GDC also assumed the Mike Conboy Note receivable in the amount of $2,902,900.06. The other liabilities assumed included GDC accrued invoices, the stockpiled iron ore cost, accrued interest on GDC's invoices, accrued property taxes for 2014 and 2015, and an asset retirement obligation. Black Iron received a loan from GDC so that it could pay CML Metals $4.5 million as the cash portion of the Purchase Price, which was allocated to pay off loans to SA Recycling (approximately $1,767,305.82) and Union Pacific ($1,746,198.35), and to pay off accounts payable ($189,704.14), a capital lease pay off to an unidentified party ($11,896.74), and to pay closing costs of $4,220. CML Metals received $780,614.95 in cash that was not broken down further on the Purchase Price Reconciliation statement [Trial Exs. 85, 203], although Mr. Bradley testified that that amount was used to pay off creditor Trafigura and the Court finds his testimony credible on that point. This combination of cash, loan forgiveness and assumption of liabilities was the value provided by the transferee.

The determination of whether or not the Purchase Price of the Mine reflects its reasonably equivalent value is complicated by the fact that the parties to the negotiations, Conboy and Steve, did not discuss the value of the Mine when they were working out the details of the sale (with the exception of discussing 'schmuck insurance,' which will be discussed later in this section). By late March 2015, after Evraz withdrew as a potential purchaser, Conboy had apparently decided to either sell the Mine to GDC or file bankruptcy. [Trial Ex. 159.] Conboy's motivation when negotiating a purchase price for the Mine was "to clear all the debt." [Trial Ex. 160, 4:10.] However, the two debts that were not paid in the Transfer were the amounts owing to Samuels Engineering (amount unknown) and WFRC.

The Court is thus left with the task of deciding if the dollar amount of clearing all the other debts and assuming the liabilities was reasonably equivalent to the value of the Mine itself. In making this determination, the Court takes into account the fact that GDC was apparently the only party interested in paying any amount for the Mine. Sagent marketed the Mine for about a year, and received only one written non-binding offer. The Court has found that those marketing efforts were reasonable. The failure of the market to produce any other buyer must be factored into any valuation analysis offered to the Court. Neither CML Metals nor GDC obtained appraisals of the assets of the Mine while negotiating this transaction. Indeed, Steve admitted that "[t]here was no due diligence" and that the entire negotiation "happened all in a matter of two or three days." [Trial Exs. 239, 240, 35:24–36:14.]

CML Metals' book value of the assets at the time they were sold in 2015 was $181,708,228. [Trial Ex. 85.] The mineral properties were listed at $115,579,100. The land was listed at $264,656. The rail line was listed at $4,492,465. The book value attributed approximately $64 million for the Mill. Conboy testified in his deposition that the Mill initially

27

cost $70 million to construct in 2012, and then another $20 million was spent in efforts to upgrade and repair it.

The Mill never did run at capacity. The difficulties with the Mill can be separated into the categories of the moisture content, the percentage grade of iron ore produced, and the tailings disposal.

Kary Jensen worked at the Mine from February 2012 through October 2014 for CML Metals. According to him, the Mill never met design capacity and was riddled with design flaws. On average, the throughput (the amount of iron ore processed) of the Mill was approximately 50% of design capacity. The plant was designed to process approximately two million tons of concentrate per year, but it never reached that amount. [*Compare* Trial Ex. 35 with Trial Ex. 113, which shows production just before the shutdown was 1.3 million tons.] Despite the goal to produce 67% Fe concentrate at ninety percent capacity, the Mill was only able to produce 67% Fe concentrate sporadically, averaging 62% or 63% most often. This lower concentration percentage did not command the premium pricing that could have made the plant more profitable. [Trial Ex. 113.] The Mill reached the 67% Fe concentrate only when running at half capacity, which in turn caused damage to the Mill because the equipment was not designed to run at such low rates. After the Mine ceased operation in October 2014, and prior to the Transfer, the Mill sustained additional damages from pipes freezing and the equipment sitting idle.

The ideal moisture level of iron ore coming out of the Mill would be around 7%, but the plant could not consistently dry the iron ore past a moisture level of approximately 8.5%, even after purchasing filter presses and installing hyperbaric filters. [Trial Testimony of Mr. Bradley and Mr. Jensen.] The Mill shut down frequently for maintenance concerns or to adjust chemicals,

which further reduced productivity. There were also difficulties in disposing of the tailings, and the inadequate tailings disposal affected the Mine's productivity.

None of these problems were resolved before the Mine was transferred to Black Iron.

The Court heard testimony from several experts who appraised the Mine in preparation for this litigation. The appraisers valued the related real Property, and the assets of the Mine such as the Mill and the mineral deposits. The valuations were given as of the approximate time of the Transfer. The valuations varied widely, depending on whether the appraiser used an asset cost, income or market valuation approach, or whether the appraiser used an orderly or forced liquidation value. There was only one comparable sale of a mine described by an expert witness, Mr. Brodkey, which is not a broad enough sampling to form a realistic guide to the value of this particular Mine based on comparable sales. This implies no criticism of Mr. Brodkey, just an observation that iron ore mines were not being bought and sold in sufficient quantities during the relevant time period to produce useful comparables.

The value of a mine or the equipment used therein would most likely be based on the income the purchaser hoped to receive from operating the mine or using the equipment. Book value, or the cost of building the assets, does not appear to be much of a factor in deciding what someone is willing to pay for mining equipment and the Court elects not to follow that approach to value. Due to the cost of tearing down and transporting the Mine's heavy and specialized equipment, salvage value would be much lower than the value of the assets in place.

Mr. Brodkey valued the Mine at approximately $91 million, which included the mineral reserves and resources, as well as the real property, the equipment, the Mill, and the load out facilities. His valuation was the most comprehensive. However, Mr. Brodkey's valuation treated CML Metals as a going concern, based on the assumption that the Mine could return to full

29

operations, and applied an income approach in reaching his conclusions. He made assumptions about the Mine's capabilities that were not borne out by other witnesses or the exhibits. Mr. Brodkey assumed the Mill could produce a 67% iron ore grade on a consistent basis, that the moisture content of the ore could be reduced to 7%, and that the tailings disposal issue was solved, which were overly aggressive assumptions that watered down his credibility on these points.

Mr. Peter Lenton, who testified in support of Mr. Brodkey's valuation, also based his assumptions on aspirational productivity rather than the Mine's actual productivity. When Sagent was actively marketing the Mine, it used a marketing presentation that included market analysis and financial projections. Sagent's marketing presentation stated that the Mine's production target was to produce 67% Fe iron ore concentrate with about 7% moisture, but that recent operations averaged 62%-64% Fe iron ore with about 9% moisture. [Trial Ex. 113.] No purchasers made binding offers based on the target amounts aspired to in the marketing presentation. Mr. Brodkey's and Mr. Lenton's valuation were thus not reflective of what an actual purchaser would pay for the Mine based on its actual operations and output at the time.

In addition, Mr. Brodkey's valuation assumed lower mine operating costs, and stated that the prices charged by GDC for operating the Mine were excessive. However, Steve testified that the mining contract between GDC and CML Metals required any successor to CML Metals to honor the mining contract. Steve also testified that the GDC contract ran with the land, however, the Court makes no finding that such is the case, only that Steve thought it was.

Mr. Philip Cook, who was engaged as a valuation expert by WFRC, testified about the value of the real property, the water rights and the rail line salvage value. He did not value the minerals or the mine operations. Mr. Cook valued the land at $1,735,000 as of May 5, 2015; the

30

water rights at $4,930,000 and the salvage value of the rail line at $240,000. This totaled $6,905,000. The Court finds Mr. Cook to be credible and his valuation is the best evidence of value for these specific assets.

Mr. Dan Ryan, who appraised the processing plant and equipment for WFRC, valued the Mill at approximately $7.9 million and the other equipment at just over $5 million, for a total of $13 million. Mr. Ryan used a liquidation value in place analysis, assuming a purchaser would use the plant and equipment intact at that location. The Court finds that using the liquidation value would not be appropriate in this proceeding.

Mr. Scott Pfeifer, the mining valuation specialist hired by Black Iron, testified that the marketing of the Mill (the processing plant and related equipment) is driven almost entirely by the market value of the metal. The iron ore market in early 2015 was depressed compared to prior years. Projects were not being funded, and customers were minimal. Mr. Pfeifer also explained the challenges of selling used mining equipment piecemeal. Most mining equipment is custom built and installed, which means there is a significant cost to dismantle and move equipment, plus the risk of buying equipment that does not have a warranty. The one comparable sale offered by Mr. Pfeifer was a plant that was not dismantled and listed for sale at $3 million; the plant has been on the market for four or five years and has not sold. Mr. Pfeifer thus valued the Mill assets in place at $5 to $7 million dollars, due mainly to the low price of iron ore at the time. The Court found Mr. Pfeifer to be a credible witness.

The mineral deposits were valued at anywhere from $115,579,100 by CML Metals' own Purchase Price Reconciliation statement dated in May 2015 [Trial Ex. 85] down to zero, which was the value ascribed to the mineral deposits by expert witnesses, Mr. Rosen and Mr. Lambert. Mr. Lambert explained the difference between mineral resources, which are not economically

31

viable to mine, and mineral reserves, which are economically viable. The economic viability of a mineral property depends on the price for the minerals, the mine design, the amount of overburden and cost of removing it, the cost of mining, and other environmental factors. Both Mr. Rosen and Mr. Lambert gave the minerals in the ground a value of zero as of May 2015 because the cost to mine the minerals would exceed the return.

When negotiating the Transfer, Conboy and Steve referred to an idea they nicknamed 'schmuck insurance.' Apparently, the concept was that if the Mine someday became profitable, Steve would pay Conboy something, apparently to compensate him for purchasing the Mine for an amount that cleared the debts but didn't provide any equity return to Conboy and the other investors. [Trial Ex. 171; Trial Ex. 173, 6:8-7:1, 11:8-17.] No terms were ever put in writing, though Steve did orally reassure Conboy that he would do the right thing. [Trial Ex. 173, 6:8-7:1, 11:8-17.] These discussions lend credence to the idea that the value of the Mine is tied to the value of the iron ore market, and that the Mine and its associated mineral deposits could increase in value in the future, and therefore valuing the iron ore deposit at zero might be unreasonable. However, it is impossible for the Court to assign a value to 'schmuck insurance.'

The Court concludes that the value of the Mine is tied more to the price of iron ore than any intrinsic value of the assets themselves. The Mine was a high-cost producer, meaning that its operational and logistical costs required a certain threshold iron ore cost before it was profitable to operate the Mine. The Mine could not be operated for an economic return at the time of the Transfer, while iron ore prices hovered around $60 per ton. [Trial Ex. 313.] Liquidation costs or values are also not a very accurate predictor of value, as the market for specialized mining equipment is small, and any purchaser would have to cover the costs of disassembling and transporting equipment. For example, two of the experts, Mr. Ryan and Mr. Pfeifer, stated that

they had never seen a used hyperbaric filter (which was used by CML Metals at the Mine) be sold, and so could not value those filters at all. Attempts to sell the Mine did not bring any binding offers, although Sagent's marketing efforts were reasonable, and undertaken in good faith.

During his trial testimony, Mr. Bradley opined that the reason the parties could not find a buyer for the Mine was the decline in iron ore prices. While the Court cannot determine the motivations of any possible purchaser, the Court does note that the uncontroverted evidence showed that iron ore prices had dropped considerably from the time period in which the Mill was being constructed in 2012 to when Sagent attempted to market the Mine during 2014. [Trial Ex. 313.]

After Sagent's marketing efforts ended, the Mine continued to incur costs in the form of the standby fees of $375,000 per month owing to GDC. [Trial Ex. 151.] Without any other party willing to purchase the Mine, Conboy elected to sell the Mine to GDC rather than file bankruptcy, and his only criteria for the purchase price was to pay off the debts. [Trial Ex. 159, 160, 4:7-19.] The Mine was diligently marketed but did not produce any binding offers; market conditions outside of the buyer's and seller's control depressed the value of the asset; and CML Metals continued to accrue the standby fees in favor of GDC, a significant ongoing expense, as long as CML Metals owned the Mine. The Transfer was essentially a rushed liquidation of the Mine to CML Metals' largest creditor's designee to avoid bankruptcy. That raises substantial red flags, but the Court has been persuaded by the evidence that the Mine could not attract any other buyer and that its value was tied to the market price for iron ore.

The Court does not give Mr. Brodkey's testimony setting the value of the Mine at $90 million much credibility. Further, the Court is concerned about Mr. Rosen's value setting the

iron ore mineral resources at zero as the Court concludes that GDC would not offer to pay anything for the Mine without the iron ore deposits. However, his estimate of value at zero as of the moment of the Transfer appears to have more credibility than the other evidence presented by WFRC. Accordingly, the Court will accept that value in this analysis.

As to the value of the Mill, Mr. Pfeifer's testimony is more credible than the testimony offered by Mr. Ryan of the same. The Mill and its related equipment were worth anywhere from $5 to $7 million as testified to by Mr. Pfeifer. The Court is persuaded that Mr. Cook's valuation was credible in determining the value of the land ($1,735,000) and water rights ($4,930,000) and that Mr. Pfeifer's valuation of $5 to $7 million for the plant is reasonable. Combining Cook's and Pfeifer's valuations together, the total is around $12 to $14 million.  As such, the Court finds that CML Metals' receipt of $13,784,346.91 was reasonably equivalent value for the Mill and all equipment therein, the iron ore stockpile, the buildings and all fixtures and furniture, all the equipment used to extract and process the iron ore, including any privately-owned rail line used for the Mine activities, the land itself, and the water rights.

Because the Court finds that CML Metals received reasonably equivalent value in the Transfer, it does not need to consider the conditions in Utah Code Ann. § 25-6-5(1)(b)(i) or (ii).

**B. Was the Transfer fraudulent under Utah Code Ann. § 25-6-6?**

In addition to the analysis under Utah Code Ann. § 25-6-5, WFRC also requests a determination that the Transfer was a fraudulent transfer under Utah Code Ann. § 25-6-6, which states:

> 1) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if:
>     (a) the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation; and
>     (b) the debtor was insolvent at the time or became insolvent as a result of the

transfer or obligation.
(2)       A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at the time, and the insider had reasonable cause to believe that the debtor was insolvent.

### 1. Utah Code Ann. § 25-6-6(1)

As stated in Section VI.A.1. of this Decision, WFRC held a claim that arose before the Transfer was made. For a Transfer to be fraudulent under this subsection of the Utah Code, the Transfer would have to be made without reasonably equivalent value while the debtor was insolvent, or the debtor became insolvent. As stated in Section VI.A.3. of this Decision, CML Metals received reasonably equivalent value for the Mine and all assets related thereto. Accordingly, the Transfer is not fraudulent under Utah Code Ann. § 25-6-6(1).

### 2. Utah Code Ann. § 25-6-6(2)

However, even if a transfer is found not to be fraudulent under subsection (1), an analysis under (2) is needed. "A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at the time, and the insider had reasonable cause to believe that the debtor was insolvent." Utah Code Ann. § 25-6-6(2).

### a. Transfer to an insider for antecedent debt

The Court has already determined that CML Metals, Steve, GDC and Black Iron were all insiders of each other. *See* Section VI.A.2.a. of this Decision. The Court has also found that a significant antecedent debt was owed by CML Metals to GDC, and that the antecedent debt was satisfied in the Transfer. *See* Sections IV.D. and VI.A.3. of this Decision. In addition, the Court has also determined that the claim for non-payment under the Leases existed before the Transfer,

35

and was thus an antecedent debt. *See* Section VI.A.1. of this Decision. Accordingly, the Court determines that this part of Utah Code Ann. § 25-6-6(2) has been met.

While Black Iron is the acknowledged recipient of the Assets in the Transfer, GDC has argued that it was not a transferee of the Assets for purposes of the UFTA because it did not take title to any of the assets. The remedies under the UFTA allow for recovery from the assets transferred, or the entry of a judgment against "the first transferee of the asset or the person for whose benefit the transfer was made." Utah Code Ann. § 25-6-9(2)(b). GDC argues that it is not a transferee, or the person for whose benefit the transfer was made, and thus WFRC may not recover from GDC under the UFTA.

The APA stated that "CML will convey the Assets to GDC or, at GDC's direction, GDC's nominee." [Trial Ex. 183.] GDC exercised its right to designate which entity received the Assets when it designated Black Iron as its nominee just a few days before the Closing. [Trial Ex. 194.] Steve, who controls GDC, created Black Iron after the APA was signed, and signed the Assignment. [Trial Ex. 194.] GDC itself did not take title to any of the Assets, although it did retain the obligations under the APA, such as the environmental liabilities, tax liabilities and the like. [Trial Ex. 194 at Schedule 1.02.]

A "transfer" under the UFTA is broadly defined as "every mode, direct or indirect, absolute or conditional, or voluntary or involuntary, of disposition of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, and creation of a lien or other encumbrance." Utah Code Ann. § 25-6-2(12).

The question is thus whether a transferee under the UFTA must actually receive the assets, or whether exercising dominion or control over the assets is sufficient to make an entity a transferee under the UFTA. The Utah Court of Appeals considered this question in *Timothy v.*

36

*Pia, Anderson, Dorius, Reynard & Moss LLC*, 424 P.3d 937, *cert. granted sub nom. Timothy v. Pia Anderson Dorius Reynard Moss*, 421 P.3d 439 (Utah 2018).[4] The alleged fraudulent transferee in *Pia* was a law firm that had received funds from a client into its trust account, and then disbursed those funds as directed by the client. The Utah court concluded that a "dominion or control" test was appropriate to determine whether or not the law firm was a transferee of the funds under the UFTA. *Id*. at 944. The court concluded that the law firm did not have dominion or control over the funds placed in its law firm trust account. The Utah Rules of Professional Conduct require a law firm to keep the property of clients separate from the lawyer's own property. "A law firm is not free to put monies deposited in a client trust account to its own use." *Id*. (quoting *PHI Fin. Services, Inc. v. Johnston Law Office, P.C.*, 874 N.W.2d 910 (N.D. 2016)). The law firm in *Pia* held the funds in a fiduciary capacity for its clients, and thus lacked the requisite dominion and control over the funds to be considered a transferee under the UFTA.

Unlike the law firm in *Pia*, GDC did not hold the Assets on behalf of either CML Metals or Black Iron in trust or as a fiduciary. A careful analysis of the reasoning in the *Pia* case leads the Court to the conclusion that GDC was a transferee of the Assets in the Transfer under the UFTA. GDC acted on its own account, and had the authority to direct the assignment and disposition of the Assets, which it used to create Black Iron and then assign its rights in the APA to Black Iron. GDC thus had 'dominion and control' over the Assets.

GDC has cited to several cases in other jurisdictions to support its argument that it was not a transferee under the UFTA, but those cases, besides being non-binding on this Court, are also distinguishable. The analysis in *In re Dreier*, 452 B.R. 451 (S.D.N.Y. 2011) centered on

---

[4] Oral argument took place in Dec. 2018, but no decision had been issued as of Aug. 30, 2019.

fraudulent transfers in a Ponzi scheme, and whether an entity was an initial transferee under the state fraud statutes at issue in that case. The court considered whether the entity was the intended beneficiary of the transfer, and if the intended benefit originated from the initial transfer. The court concluded that the complaint did not allege sufficient facts to show that the entity benefitted from the transfers. *See id*. at 466. In the case before this Court, GDC was able to choose its benefit, making the *Dreier* case distinguishable. Rather than receiving the Assets itself, GDC, just prior to the Closing, chose to direct them into a separate entity (Black Iron) which was also owned and controlled by Steve. In addition, as reflected on the Purchase Price Reconciliation, GDC settled $2,988,746.03 that CML Metals owed to GDC as part of the consideration for in the Transfer. Further, the Assets went to an entity that would continue to use GDC's mining services if and when the Mine becomes operational again.

The other cases cited by GDC to support its argument that the ability to assign rights is not dominion or control over property are similarly inapposite. For example, GDC cited *In re Dews*, 152 B.R. 982 (D. Colo. 1993) to argue that assigning a right is distinguishable from having control over the assets. However, that case concluded that the right to receive profits was an interest in property. As such, the Court does not find the *Dews* case to be persuasive in this matter. Likewise, GDC also cites to *In re Trejo*, 44 B.R. 539 (E.D. Cal. 1984) (holding that a debtor's assignment of a right to receive payment is a transfer within the meaning of the section of the Bankruptcy Code governing preferential transfers); and *In re Caraway*, 61 B.R. 1000 (D.N.M. 1986) (discussing that the right to direct receipt of payment is a transfer of an interest in property), which, for the same reason stated above, the Court finds not to be persuasive in the current matter. Accordingly, the Court is not persuaded by GDC's theory that an assignment of rights is distinguishable from having control over the assets.

38

The Court bases its determination that GDC is a transferee within the meaning of the UFTA on the fact that GDC was able to control the disposition of the Assets. Steve (owner and controlling party of GDC) did, in fact, create a new legal entity, decided how to divide the benefits and obligations of the Transfer between GDC and Black Iron, and otherwise had full control over the structure of the Transfer. The fact that Black Iron took title to the Assets themselves will not insulate GDC from the fraudulent transfer analysis.

### b. Insolvency

The other requirement in Utah Code Ann. § 25-6-6(2) is that the debtor be insolvent at the time of the transfer, and the insider has reasonable cause to believe that the debtor was insolvent. This section of the statute requires the Court to determine whether CML Metals was insolvent at the time of the Transfer, or became insolvent as a result of the Transfer. The parties have stipulated to the conclusion that CML Metals was insolvent at the time of the Transfer and the Court agrees with the same.

### c. Insider Knowledge of the Insolvency

Finally, under Utah Code Ann. § 25-6-6(2), a determination of knowledge of the insolvency is needed. The insider, whether that insider was Steve, GDC, or Black Iron, had reasonable cause to believe that CML Metals was insolvent. Steve had phone calls from Conboy, who represented that CML Metals was out of money and on the brink of bankruptcy. [Trial Ex. 160, 3:17-5:13.] There were emails to GDC evidencing CML Metals' financial difficulties. [Trial Exs. 99, 100.] Because Steve knew of CML Metals' precarious financial situation and because of his position with GDC and Black Iron, they too, knew that CML Metals was insolvent at the time of the Transfer.

39

Thus, WFRC has established and the Court concludes that there was a transfer by a

debtor (CML Metals), that WFRC was a creditor of CML Metals, that WFRC's claim arose

before the Transfer was made, that the Transfer was made to an insider (GDC and/or Black Iron),

that CML Metals was insolvent at the time of the Transfer and that GDC and Black Iron had

reasonable cause to believe that CML Metals was insolvent. *See* Utah Code Ann. § 25-6-6(2).

Accordingly, WFRC has met its burden under this section of the Utah law and the Court finds

that there was a fraudulent transfer from CML Metals to Black Iron and GDC.

## VII.   DAMAGES

With a determination of liability against GDC and Black Iron, it is incumbent upon the

Court to determine damages. There are four sources of potential damage awards in this case:

conversion damages against Black Iron, breach of contract claims against CML Metals under the

Leases, a stipulated judgment against CML Metals, and a default judgment against CML

Railroad.

### A. Double Recovery Prohibited

The Court is sensitive to the possibility of double recovery by WFRC, and wishes to

avoid an inequitable result. WFRC will receive a money judgment against the transferees Black

Iron and GDC that may be pursued under the UFTA, as described in Section VII.D. of this

Decision. WFRC will also receive a separate judgment against Black Iron for conversion

damages. "While a plaintiff is entitled to proceed on various theories of recovery, the theories

must  be pursued with caution [to avoid duplication]." *U.S. Industries, Inc. v. Touche Ross &*

*Co.*, 854 F.2d 1223, 1259 (10th Cir. 1988) (alteration in original) (*impliedly overruled on other*

*grounds as recognized by Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215, 1231 (10th Cir.

1996)). Generally, "double recovery is precluded when alternative theories seeking the same

40

relief are pled and tried together." *Clappier v. Flynn*, 605 F.2d 519, 530 (10th Cir. 1979); *see also*

*MidAmerica Fed. Save & Loan Assoc. v. Shearson/American Express, Inc.*, 962 F.2d 1470, 1473

(10th Cir. 1992).

The Court elects to impose an end date on the damages for breach of the Leases to avoid

having damages for the unpaid rent extend past the Conversion Date. It would not be equitable to

allow WFRC to recover damages for lost rent at the same time it was awarded the full value of

the Railroad Equipment on the Conversion Date. When a plaintiff is awarded the value of his

property at the time of the conversion, he is not entitled to additional damages for the loss of use

of his property. *See Henderson v. For–Shor Co.*, 757 P.2d 465, 470 (Utah Ct. App. 1988).

"Allowing a plaintiff to recover both market value and damages for loss of use would be

tantamount to an award of double damages inasmuch as it would equate to charging the

defendant for the property and then continuing to charge rent for its continued possession."

*Mahana v. Onyx Acceptance Corp.*, 96 P.3d 893, 899 (Utah 2004).

While the Court was unable to find Utah case law dealing with double recovery of claims

under the UFTA, other state courts have found that the rule against double recovery is applicable

in such instances, analyzing their adopted version of the Uniform Fraudulent Transfer Act. *See*

*e.g. Renda v. Nevarez*, 167 Cal. Rptr. 3d 874 (Cal. Ct. App. 4th Dis. 2014) (upholding the trial

court's decision denying the entry of money judgment sought under the UFTA, because it would

be a partial duplicate of a money judgment the plaintiff already obtained in a prior action; thus, it

would violate the rule prohibiting double recovery for the same harm); *Barber v. Westbay* (*In re*

*Integrated Agri, Inc.*) 313 B.R. 419, 429 (Bankr. C.D. Ill. 2004) ("[i]f brought under in a single

action, the prevailing Plaintiff would be allowed a single recovery, either on the note claim or

one of the UFTA claims").

41

The UFTA is subject to common law principles of law and equity. *See* Utah Code Ann. §
25-6-11 ("Unless displaced by this chapter, the principles of law and equity . . . supplement this
chapter's provisions."). The language of the UFTA states that "a creditor . . . may obtain"
avoidance or attachment (Utah Code Ann. § 25-6-8(1)(a)), and that the creditor's relief is
"subject to applicable principles of equity." *Id*. at (1)(c). When fashioning a remedy, the court is
given leeway to provide "any other relief the circumstances may require." *Id*. at (c)(iii).
"Ordinarily, when a statute provides a court 'may' do something, the statute is permissive, not
mandatory, and grants the court a discretionary authority." *Renda v. Nevarez*, 167 Cal. Rptr. 3d
874, 877–78 (Cal. Ct. App. 4th Dis. 2014) (fashioning a remedy under the California UFTA,
which has the same wording as the Utah UFTA).

Accordingly, this Court has discretion to fashion an equitable remedy adapted to the
specific circumstances of this case. WFRC suffered the loss of income and use of the Railroad
Equipment. The damages were caused by different entities, *i.e.,* CML Metals through the breach
of the Leases, and Black Iron by converting the Railroad Equipment, but WFRC's recovery
should not be duplicative or overlap.

With these principles in mind, the Court turns to a discussion of the various theories of
damages.

**B. Damages for Conversion**

After the Transfer in May 2015, WFRC worked to remove its Railroad Equipment from
the Property that CML Metals had transferred to Black Iron. Black Iron withdrew its permission
for WFRC to come onto its Property and retrieve the Railroad Equipment. WFRC filed a motion
for summary judgment, asking the Court to find that Black Iron converted the Railroad
Equipment when it withdrew its permission for WFRC to come onto its Property to remove the

42

Railroad Equipment. The Court granted WFRC's motion for summary judgment. The

determinations regarding the interactions between the parties from the Transfer date and

throughout the summer of 2015 are memorialized in the Memorandum Decision on Conversion.

[Dkt. No. 441.] Some of the factual assertions and evidence referred to in this section are drawn

from the record prepared for summary judgment and were not introduced at the Trial. The Court

determined that Black Iron converted the Railroad Equipment on Aug. 20, 2015, which is the

Conversion Date. The question of damages for conversion was reserved for this Trial. There are

several components of this analysis:

### 1. The Conversion Date

After the Transfer on May 5, 2015, WFRC began efforts to remove its Railroad

Equipment from the Property that now belonged to Black Iron. Throughout that summer, WFRC

communicated with Black Iron regarding the removal efforts. The details of these interactions

are set forth in the Memorandum Decision on Conversion. [Dkt. No. 441.] On Aug. 20, 2015, the

employee at Black Iron who had been communicating with WFRC about its efforts to remove

the Railroad Equipment sent an email stating:

> Please be advised due to legal issue pertaining to storage and security of the rail cars
> sitting on the Black Iron, LLC property these car cannot be moved until these issues are
> resolved. This is a notification to cease and desist the plan to start interaction on the cars
> next week. [Case No. 17-2088, Dkt. No. 68, Exh. L (errors in original).]

On summary judgment, the Court determined that the date of this email was the

Conversion Date.

In the proposed Joint Pretrial Order submitted to the Court two weeks before the Trial

began, Black Iron asserted the defense against WFRC that "Plaintiffs failed to mitigate their

damages, if any." [Dkt. No. 557.] This reference to damages referred to the amount of WFRC's

damages for conversion. WFRC contended that the issue of whether or not WFRC had acted

reasonably in its attempts to retrieve the Railroad Equipment had already been settled by the

Court on summary judgment. The Court discussed the issue with the parties off the record. The

Court then allowed Black Iron permission to present evidence on the question of whether or not

WFRC failed to mitigate its damages between the dates of Sept. 17, 2015 and Aug. 22, 2016 (the

"Mitigation Period"). The assumption underlying Black Iron's request was that WFRC had

permission to retrieve its Railroad Equipment between those two dates. The Court has not made

factual findings on this underlying assumption. The evidence presented by Black Iron that

WFRC had permission to retrieve its Railroad Equipment during the Mitigation Period is not

conclusive. There is a dispute about whether or not WFRC had permission to remove its Railroad

Equipment from Black Iron's Property during the Mitigation Period, or whether WFRC was only

able to bring a repair team onto the Property, but not allowed to remove its Railroad Equipment.

The beginning date of the Mitigation Period, Sept. 17, 2015, was drawn from an email

sent from WFRC's attorney to Steve and Cyndi Gilbert. The attorney stated "Thank you for

taking the time to talk to Bobby and me. Based on our call, it is my understanding that Black

Iron will allow [WFRC] onto Black Iron's property to remove [WFRC's] locomotives and

railcars. Please confirm whether this is accurate." [Trial Ex. 581.] Black Iron contended that this

email gave WFRC permission to retrieve its Railroad Equipment. However, if Steve and Cyndi

Gilbert ever confirmed the permission as requested in the email, that confirmation was not

presented to the Court at the Trial.

The record before the Court on summary judgment showed that permission to enter Black

Iron's Property was granted on March 15, 2016, when an attorney for Black Iron authorized

WFRC to enter Black Iron's property to repair and extract the equipment. [Dkt. No. 400, MSJ

Ex. N.] Storage costs for the Railroad Equipment were demanded in writing by letters dated

April 4, 2016 [Case No. 17-2088, Dkt. No. 68, Exh. Q] and July 12, 2016 [Case No. 17-2088,

Dkt. No. 68, Exh. M]. Wells Fargo Rail hired a contractor in late spring 2016 to repair and move

the Railroad Equipment, and while there are email communications discussing the work

necessary to move the Railroad Equipment, no railcars were ever actually removed from Black

Iron's Property because the repair vendor hired by WFRC stated that repairs were necessary

before the Railroad Equipment could be moved. [Case No. 17-2088, Dkt. No. 68, Exh. I.] In

July, 2016, a repair crew traveled from Missouri to Utah with the vehicles and equipment to

repair and extract the Railroad Equipment. [Case No. 17-2088, Dkt. No. 68, Exh. K.]

The ending date of the Mitigation Period, Aug. 22, 2016, was based on a letter sent by

Black Iron, demanding payment of $23,058,000 for storage fees as of that date, and a statement

that WFRC would not be allowed to retrieve its Railroad Equipment without paying that amount:

> [I]n order to resolve the controversy over whether Black Iron will permit removal of the
> railcars without payment for storage fees, please notify your clients [WFRC] that they
> may continue to repair the railcars, but they may not be removed without payment to
> Black Iron. [Dkt. No. 400, MSJ Ex. N]

At the Trial, Black Iron contended that between Sept. 17, 2015 and Aug. 22, 2016,

WFRC had the opportunity to retrieve its Railroad Equipment. Union Pacific Railroad owned

some of the tracks, and required specific repairs and inspections before the Railroad Equipment

could be moved on those tracks. [Trial Ex. 429; Trial Testimony of Greg Johnson.] WFRC did

not want to pay to repair the tracks, as it did not own the tracks. Union Pacific did not want to

repair the tracks either. Union Pacific's position was that Black Iron would need to hire an

engineering firm to handle track repairs, because the rail line was apparently leased to Black

Iron. [Trial Ex. 440.] Regardless of which party was responsible for rail line repairs, the repairs

45

were not made and the Railroad Equipment was not moved before the Aug. 22, 2016 letter was sent. The Court finds and concludes that WFRC acted diligently and did not fail to mitigate its damages during the Mitigation Period.

WFRC's valuation expert valued the railcars as of the Conversion Date of Aug. 20, 2015. At the Trial, Black Iron argued that there was no evidence about the value of the railcars on Aug. 22, 2016, which was the end date of the Mitigation Period. The Court notes that by the time Black Iron argued that it should be allowed to present argument that WFRC failed to mitigate its damages, expert discovery had long since closed. WFRC had no opportunity to ask its expert to value the railcars as of Aug. 22, 2016. In addition, arguing that the railcars should be valued as of Aug. 22, 2016 misconstrues the permission granted to Black Iron to argue that WFRC failed to mitigate its damages during the Mitigation Period. Implying that the Conversion Date should be pushed back to Aug. 22, 2016 for purposes of valuation exceeds the scope of what the Court allowed Black Iron to argue.

Accordingly, for the purpose of awarding damages for conversion, the Court determines that the applicable valuation date is Aug. 20, 2015.

### 2. Damages for Conversion

"[T]he measure of damages for conversion when property is not returned is the value of the property at the time of the conversion, plus interest." *Henderson v. For-Shor Co.*, 757 P.2d 465, 468 (Utah Ct. App. 1988) (quoting *Madsen v. Madsen*, 72 Utah 96, 102, 269 P. 132, 134 (1928)). "This measure is appropriate because the remedy for conversion is analogous to a forced sale of the converted property from the plaintiff to the defendant." *Mahana v. Onyx Acceptance Corp.*, 96 P.3d 893, 899 (Utah 2004).

46

"Market value is defined as the price for which the property is bought and sold at retail in the marketplace or, in the case of unique property, the value to the owner." *Henderson,* 757 P.2d at 468 (citing *Winters v. Charles Anthony, Inc*., 586 P.2d 453, 454 (Utah 1978)). "However, rules relating to the measure of damages are flexible, and 'can be modified in the interest of fairness.' The primary objective in rendering an award of damages for conversion is to award the injured party full compensation for actual losses." *Henderson*, 757 P.2d at 469 (internal citation omitted); *see also Mahana v. Onyx Acceptance Corp*., 96 P.3d 893, 899 (Utah 2004) ("To the extent possible, the fundamental purpose of compensatory damages is to place the plaintiff in the same position he would have occupied had the tort not been committed.").

WFRC's expert witness who appraised the railcars, Pat Mazzanti, testified credibly. He stated that this specific type of open-top hopper railcar was in oversupply by 2015 and had been for about eight or ten years. These types of railcars had been commonly used to haul coal, but with coal demand decreasing, there was less demand for these types of railcars, causing an oversupply and a substantial decrease in the value of the railcars. Mr. Mazzanti took those issues into account when determining the value of the Railroad Equipment. As of August 2015, Mr. Mazzanti valued each railcar at $20,000 per car, for a total of $10,800,000 for the 540 railcars. The 2015 value of the four locomotives was $175,000 each, which works out to $700,000. The total value of the Railroad Equipment in August 2015 was thus $11,500,000.

On or about July 16, 2018, WFRC sold the Railroad Equipment to AMG Resources. The purchase price was $62,500 for each of the 4 locomotives and $6,230.40 for each of the 540 cars, for a total price of $3,614,416. [Trial Ex. 294.]

Accordingly, the conversion damages will be reduced by the $3,614,416 that WFRC received for the Railroad Equipment in 2018. The Court determines that the conversion damages

are $11,500,000 less $3,614,416 for a total of $7,885,584. WFRC did not request prejudgment

interest on the conversion damages, and hence, none is awarded.

### C. Damages for Breach of the Leases

CML Metals did not dispute that it defaulted on the Leases when it stopped making

payments as of Nov. 1, 2014. There are three Leases for the hopper railcars (Hopper Lease #1,

Hopper Lease #2 and Hopper Lease #3, which will be referred to collectively as the "Hopper

Leases"), [Trial Exs. 25, 34, 44] and one Locomotive Lease [Trial Ex. 42].

### 1. Liquidated Damages Provision.

WFRC has claimed damages for breach of the Leases at the rate of 200% of the monthly

rental rate, relying on a similar provision in all four of the Leases. While CML Metals did not

defend itself against these claims, Black Iron has challenged the assessment of damages

measured at 200% of the rental rate.

To determine damages, the Court turns to the Leases themselves. While there are four

separate Leases, the provisions are substantially similar. [Compare Trial Exs. 25, 34, 42, 44.]

The Court will use Hopper Lease #1 [Trial Ex. 25] and note any relevant differences as

necessary. Hopper Lease #1 identifies two relevant "Events of Default" in section 18:

> (a) Lessee fails to make any payment of any part of the Rent or any other amount payable
> to Lessor under this Lease and such nonpayment continues for ten (1) calendar days after
> the due date thereof;
> . . .
> (e) Lessee ceases doing business as a going concern or transfers all or a substantial part of
> its assets . . . .

WFRC identified both of these Events of Defaults in the Default Letters sent to CML

Metals in mid-November 2014. [Trial Exs. 116, 117, 118, 119.] The Remedies upon default are

defined in Section 19 of the Hopper Leases (Section 18 of the Locomotive Lease), and allow the

Lessor to:

> (i) proceed by appropriate court action(s) either at law or in equity, to enforce Lessee's performance under this Leases or to recover damages for the breach thereof;
>
> (ii) by notice in writing to Lessee terminate this Lease, whereupon all rights of Lessee to the use of the Units shall absolutely cease and terminate, but Lessee shall remain liable as herein provided;
>
> (iii) require Lessee, at Lessee's expense, to return any or all of the Units in accordance with the return provisions of this Lease, or Lessor or its agent, at its option may in a reasonable manner and without damage to the property of Lessee or any third party enter upon the premises of Lessee or other premises where any of the Units may be and take possession of all or any of such Units and thenceforth hold, possess and enjoy the same free from any right of Lessee, or its sublessee(s), successors or assigns, to use the Units for any purposes whatsoever;
>
> (iv) declare immediately due and payable all Rents and other amounts due and to become due under this Lease;
>
> (v) sell by public or private sale, release, hold, retain, or otherwise dispose of the Units in any manner Lessor chooses, free and clear of any claim or rights of Lessee; and
>
> (vi) exercise any other right or remedy then available to Lessor at law or in equity.

WFRC has claimed damages for breach of the Leases at the rate of 200% of the rental

rate pursuant to Section 17 of the Leases, which states:

> (a) <u>Return</u>. On or about the expiration of the Term Lessee shall return the Units to Lessor at either a location in the Chicago, IL area, or to a location of equal distance as between Iron Springs, UT and Chicago, IL, each as determined by Lessor (any such location the "Return Point"). Lessor shall notify Lessee of the Return Point, and within 10 calendar days of receipt of such notice and at its sole expense, Lessee will deliver possession of the Units to Lessor at the Return Point. . . . Lessee shall continue to pay Rent and this Lease shall remain in full force and effect with respect to each Unit until such Unit is returned to Lessor at the Return Point. . . . If upon the expiration or earlier termination of this Lease Lessor demands in writing the return of any Unit to the Return Point and Lessee fails to deliver such Unit to the Return Point within ten (10) calendar days of receipt of such notice, Rent shall cease and Lessee shall immediately commence to pay to Lessor (as liquidated damages and not as a penalty) a monthly late fee equal to two hundred percent (200%) of the monthly rental rate for such Unit then in effect until such Unit is delivered to the Return Point. All other terms and conditions of this Lease shall remain in force. The provisions of this section are without prejudice to, and in addition to, any other remedies of Lessor. If Lessee shall for any reason fail to deliver any Unit to Lessor within ninety (90) days of the expiration of the Term, Lessor shall have the option to declare that such Unit has suffered a Casualty Occurrence.
>
> [Trial Ex. 25.]

Whether or not WFRC is entitled to damages equal to 200% of the rental rate is governed by the language of the contract itself. The Court notes that Section 17 is not part of the Default section, nor is the 200% rate included in the Remedies for Default. In the paragraph allowing the Lessor to require return of the Units due to default, there is no provision to impose liquidated damages of 200% of the Rent, but there is a reference to the return provision of the Leases. [*See* Trial Ex. 25 at Section 19(a)(iii).] As such, the Court concludes that the 200% liquidated damages rate is not an automatic Remedy upon Default and should not be applied to the defaults referred to in the Default Letters. Instead, the 200% rate must be specifically triggered by carefully following the terms of the Leases.

Section 17 itself contains two different rates that can be imposed pending the return of the Units. The standard Rent continues, pursuant to the first half of Section 17(a), after the Lessor notifies the Lessee of the Return Point and until the Units are returned. The 200% rental rate is provided for in the second half of that same paragraph. The 200% rate commences, and Rent ceases, "[i]f upon the expiration or earlier termination of this Lease Lessor demands in writing the return of any Unit to the Return Point and Lessee fails to deliver such Unit to the Return Point within ten (10) calendar days of receipt of such notice . . . ." Thus, in order to receive the 200% rate, WFRC would need to follow all of the Lease terms that trigger that provision, which are: (1) the Lease has expired or been terminated; (2) the Lessor demanded in writing the return of any Unit; and (3) the Lessor notified the Lessee of the Return Point.

### a. Lease Termination

The Default Letters did not terminate the Leases [Trial Exs. 116, 117, 118, 119], and so the Leases remained in effect, but in default. WFRC demanded immediate payment, and reassurance that CML Metals would continue operating as a going concern, but it did not

50

terminate the Leases, demand the return of the Railroad Equipment, or give a specific Return

Point. In the Default Letters, WFRC reserved its rights to exercise any other remedies under the

Leases. One of the Remedies upon default is for the Lessor to retrieve the Railroad Equipment

itself. [*See* Trial Ex. 25 at paragraph 19(a)(iii).] It appears by WFRC's actions that it eventually

chose to exercise this right when it attempted to retrieve the Railroad Equipment after the

Transfer to Black Iron. However, if WFRC ever gave written notice that the Leases were

terminated, the Court did not hear evidence of it (although WFRC argued that filing the

Complaint later did, which is discussed below). As such, the Leases would have remained in

effect until they expired under their own terms. However, even after the Leases had expired, the

other two conditions would need to be met before the 200% rate could be imposed.

### b. Designated Return Point

The 200% rate does not activate until 10 days after the Lessor makes a written demand

for return of the Units, and notifies the Lessee of the Return Point. At trial, WFRC argued that

the Leases themselves designated a Return Point, but the Court disagrees. Section 17(a) of the

Hopper Leases refers to "a location in the Chicago, IL area, or to a location of equal distance as

between Iron Springs, UT and Chicago, IL, each as determined by Lessor (any such location the

"Return Point")." The Court interprets this sentence to mean that the Return Point would be in

the general area designated by the Leases, but needed to be specifically "determined by Lessor."

In addition, Section 17(a) states that "Lessor shall notify Lessee of the Return Point." No such

notification would be necessary if the Return Point were already identified.

The Locomotive Lease identified a Return Point in Section 16 [Trial Ex. 42], and so

further designation of a Return Point by the Lessor would not be necessary.

### c. Written Demand for Return

WFRC argued at trial that the Answer, Counterclaims and Third-Party Complaint filed on

May 15, 2015 in the District Court of Utah (the "Complaint") [Trial Ex. 209] demanded the

return of the Railroad Equipment, and that was sufficient under the Lease to trigger the 200%

rental rate. The Court finds this argument unavailing.

The Leases required any notices to be sent to CML Metals by fax, overnight air courier,

or by certified mail to the address designated in Section 22 of the Hopper Leases and Section 21

of the Locomotive Lease. [Trial Exs. 25, 42.] WFRC did not provide evidence that the

Complaint had been served in a manner that complied with the Notice provision of the Leases.

The Complaint also does not demand that the Units be returned to a designated Return Point.

Instead, the Complaint stated that WFRC is entitled to specific performance of CML Metals'

obligations to return the Railroad Equipment. [Trial Ex. 209.] This did not set a Return Point, nor

did it contain the language required by the Leases that would precede the right to claim the 200%

rental rate.

While it does not appear that CML Metals had the ability to comply with a demand to

return the Railroad Equipment, making the demand in precisely the manner set forth in the

Leases would be a necessary prerequisite before WFRC could claim the specific damages in the

Leases.

The Court finds and concludes that filing and serving the complaint was not Notice that

complied with Section 22 of the Hopper Leases or Section 21 the Locomotive Lease. In addition,

WFRC did not designate a Return Point as required by Section 17 in the Hopper Leases for the

hopper railcars. Therefore, the 200% rate was not triggered.

## 2. Damages Calculation

Damages for breach of the Leases will be calculated at 100% of the Rent. Hopper Lease

#1 and Hopper Lease #3 ended on July 31, 2015 [Trial Ex. 25 at Section 4(a); Trial Ex 95 at

Section 2]. The Locomotive Lease ended on Dec. 31, 2015 [Trial Ex. 42 at Section 3]. Only

Hopper Lease #2 had a lease term that extended beyond the Conversion Date [Trial Ex. 34 at

Section 3]. However, each Lease provided that Rent would continue to be charged until the

Railroad Equipment was returned [Trial Exs. 25 at Section 4(a); Trial Ex. 44 at Section 4; Trial

Ex. 34 at Section 4(a); Trial Ex. 42 at Section 4]. The Court will assess 100% Rent through the

Conversion Date, pro-rating the partial month of August, as conversion took place on Aug. 20,

2015.

The interest rate on any amount due and unpaid under the Leases is "one and one half

percent (1.5%) per month or the maximum rate permitted by law, whichever is less," assessed

from its due date until the date payment is made. [Trial Ex. 25 at 19(b).] The Leases are

governed by California law [Trial Ex. 25 at Section 23(f)]. The California statute that governs

the rate of interest that can be assessed after a breach of contract states: "Any legal rate of

interest stipulated by a contract remains chargeable after a breach thereof, as before, until the

contract is superseded by a verdict or other new obligation." Cal. Civ. Code § 3289(a) (West).

The Court finds and concludes that the conversion of the Railroad Equipment by Black Iron

superseded the Leases and created a new obligation as that term is used in the Cal. Civ. Code.

Thus, the interest under the Leases ceased accruing on the Conversion Date.

### a. Damages under Hopper Lease #1

Hopper Lease #1 covered 148 railcars at a lease rate of $305 per railcar per month (a total

of $45,140), with the lease period ending on July 31, 2015. [Trial Ex. 25.] The amount of rent

from Nov. 1, 2014 through July 31, 2015 is $406,260. The pro-rated rent for the 20 days of

August would be $29,122 ($45,140 divided by 31 multiplied by 20), for a total of $435,382.

### b. Damages under Hopper Lease #2

Hopper Lease #2 covered 288 railcars at a lease rate of $350 per railcar per month (a total

of $100,800). The amount of rent from Nov. 1, 2014 through July 31, 2015 is $907,200. The

amount due for the partial month of August 2015 is $65,032, for a total of $972,232.

### c. Damages under Hopper Lease #3

Hopper Lease #3 covered 103 railcars, at a lease rate of $305 per month [Trial Ex. 44] (a

total of $31,415). The amount of rent from Nov 1, 2014 through July 31, 2015 is $282,735. The

pro-rated rent for the 20 days of August would be $20,267, for a total of $303,002.

### d. Damages under the Locomotive Lease

The Locomotive Lease covered four locomotives, with a lease rate that changed yearly,

but was at $235 per locomotive per day at the time of the Default. Because the locomotive rent

was assessed on a daily basis, the monthly rent changed depending on how many days were in

the month. Exhibit 315, prepared by expert witness Rick Hoffman, calculated the rent for months

with 30 days at $21,150 and rent for months with 31 days at $21,855. The Court notes that these

calculations are based on three locomotives, rather than four. This appears to be an error.[5]

However, the Court will use the rate provided in Trial Ex. 315[6] to calculate damages under the

---

[5] The statements of the parties throughout this proceeding have assumed that four locomotives were leased, and in
fact, all of the pertinent documents state that there were four locomotives. [Trial Ex. 42; Plaintiffs' Proposed
Findings of Fact and Conclusions of Law, Dkt. No. 501 at paragraphs 1, 2(c) and 171.] The 'Locomotive Lease Late
Fees' in the same exhibit appear to be calculated based on four locomotives. [Trial Ex. 315.] When the locomotives
were sold in July 2018, the purchase confirmation listed four locomotives. [Trial Ex. 294.]

[6] The Court received Exh. 315 as a summary of Mr. Hoffman's testimony. The parties referred to it as a
demonstrative exhibit, and it is helpful to the Court in making this analysis. Accordingly, the Court relies on it and
Mr. Hoffman's testimony.

Locomotive Lease. Continuing from where Mr. Hoffman's exhibit left off calculating 100% rent in May (for a total rent from Nov. 2014 through May 2015 totaling $149,460), the Court will add $21,150 for the June rent, $21,855 for the July rent and $14,100 for the partial month of August. Thus, the total amount of rent due under the Locomotive Lease from Nov. 2014 through Aug. 20, 2015 is $206,565.[7]

### e. Total Damages under the Leases

The total unpaid rent for all four Leases is $1,917,181. With interest compounded monthly at a rate of 1.5% from Nov. 2014 through Aug. 20, 2015 and then added to the cumulative total, the Court calculates the amount of damages for unpaid rent as of the Conversion Date as $2,134,312.44.

### 3. Repair Costs

WFRC incurred $484,368 for repair costs in its attempt to extract the Railroad Equipment. [Trial testimony of G. Johnson.] The Leases state that the Lessee is liable for all repair costs. [Trial Exs. 25, 34, 42, 44 at § 19(d) in the Hopper Leases and § 18(d) in the Locomotive Lease.]

The Court thus finds and concludes that WFRC is entitled to repair costs of $484,368 as part of its damages.

### 4. Attorney Fees

In its prayer for relief in the Complaint [Dkt. No. 7, Case 17-2088], WFRC asked for an award of attorney fees. The Leases state that the Lessee "shall be liable for all costs, expenses and damages incurred by Lessor by reason of the occurrence of any Event of Default or the

---

[7] If the rent was calculated using four locomotives, it would increase by $67,915.

exercise of Lessor's remedies with respect thereto, including, but not limited to, all reasonable

attorneys' fees and costs . . . costs related to the repossession, storage, repair, inspection, and

transportation or other disposition of the [Railroad Equipment], and all incidental and

consequential damages." [Trial Exs. 25, 34, 42, 44 at Section 19(d) (Hopper Leases) or Section

18(d) (Locomotive Lease).] However, WFRC did not pursue the request for attorney fees at trial.

In addition, in a Stipulated Judgment (described further in Section VII.E.1. of this Decision)

entered against CML Metals approximately three months before trial, WFRC made a claim for

breach of the Leases, but the amount did not include attorney fees. [Dkt. No. 559.] WFRC did

not brief or discuss whether or not attorney fees incurred after the Transfer could be part of a

claim under the UFTA. The Proposed Findings of Fact and Conclusions of Law submitted by

WFRC did not ask for attorney fees. [Dkt. No. 501.] The Joint Pretrial Order also did not ask the

Court to award attorney fees to WFRC. [Dkt. No. 574.] As such, the Court deems the request for

attorney fees to be abandoned. Each party will bear its own attorney fees.

### D. Remedies under the UFTA

The Utah Supreme Court has declared that the purpose of the UFTA is "to prevent

insolvent debtors from transferring all of their assets to avoid their creditors' claims, and to

provide a means whereby creditors can collect against a fraudulently transferred asset." *Porenta

v. Porenta*, 416 P.3d 487, 492 (Utah 2017). To that end, the UFTA permits a creditor to seek a

variety of remedies. *See* Utah Code Ann. §§ 25-6-8, 25-6-9. The relief a creditor may obtain

under the UFTA is set forth in Utah Code Ann. § 25-6-8 and limited by Utah Code Ann. §

25-6-9. Once the Court determines a transaction is fraudulent under the UFTA, the creditor may

obtain:

(a) avoidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim;

(b) an attachment or other provisional remedy against the asset transferred or other property of the transferee in accordance with the procedure prescribed by the Utah Rules of Civil Procedure;

(c) subject to applicable principles of equity and in accordance with applicable rules of civil procedure:

      (i) an injunction against further disposition by the debtor or a transferee, or both, of the asset transferred or of other property;

      (ii) appointment of a receiver to take charge of the asset transferred or of other property of the transferee; or

      (iii) any other relief the circumstances may require.

While the Transfer meets the definition of being fraudulent and therefore voidable under the statutory terms,[8] the Court elects not to avoid the Transfer itself, given the complexity of the transaction and the complications of unwinding a transaction that took place four years ago. Instead, the Court will award WFRC a monetary judgment against GDC and Black Iron as transferees.

Under the UFTA, the amount of a judgment is "the value of the asset transferred, as adjusted under Subsection (3), or the amount necessary to satisfy the creditor's claim, whichever is less." Id. § 25-6-9(2). Therefore, the judgment amount a creditor may obtain for a fraudulent transfer claim brought under Utah Code Ann. § 26-6-2(2) is based on either the value of the asset transferred or the creditor's claim; it is not affected by the amount of an insider's antecedent debt. *See id.* § 25-6-6(2).

The value of the Assets transferred is $13,784,346.91. The value of WFRC's claim within the meaning of Utah Code Ann. § 25-6-2(3) (defining 'claim') against CML Metals for

---

[8] Per Utah Code Ann. § 25-6-5, the Transfer was fraudulent based on the Court's finding of the debtor's intent to hinder or delay the creditor. The Court's finding that CML Metals received reasonably equivalent value for the Mine itself does not prevent the Transfer from meeting the definition of a fraudulent transfer. The Court also found that the Transfer was fraudulent pursuant to Utah Code Ann. § 26-6-6(2).

breach of the Leases, as determined in this memorandum decision, is $2,134,312.44 (unpaid rent

with 1.5% interest compounded monthly through the Conversion Date) plus $484,368 (repair

costs) for a total of $2,618,680.44 (the "UFTA Claim"). The Court finds that $2,618,680.44 is

"the amount necessary to satisfy the creditor's claim" pursuant to Utah Code Ann. § 25-6-

9(2)(a).

 While Black Iron raised two statutory defenses in the Pretrial Order, good faith transferee

status and the new value defense, it did not argue these defenses at the Trial and the Court deems

them abandoned.

### E. Judgments Entered Prior to Trial

#### 1. Stipulated Judgment against CML Metals

 On March 8, 2019, the Court entered a stipulated judgment in favor of WFRC and against

CML Metals [Dkt. No. 559] for $23,988,912 for the First, Second, Third, and Fourth claims for

relief asserted in WFRC's amended complaint [Dkt. No. 7, Case No. 17-2088]. Those claims for

relief are based on the breach of Hopper Lease #1, Hopper Lease #2, the Locomotive Lease, and

Hopper Lease #3, respectively. That amount covers unpaid rent for November 2014 through May

or June of 2015, and then late fees, which are assessed at the 200% liquidated damages provision

found in each of the Leases, running from May or June 2015 through July 2018, when the

railcars were sold. A 1.5% interest rate, compounded monthly, was calculated on the amounts

due.

#### 2. Default Judgment against PIC Railroad, Inc.

 On September 5, 2018, the Court entered a default judgment in favor of WFRC and

against PIC Railroad, Inc. d/b/a CML Railroad in the amount of $6,781,651, exclusive of post-

judgment interest (the "Default Judgment") for breach of Hopper Lease #3 and breach of the

Locomotive Lease. [Trial Ex. 300; Dkt. No. 320.] The amount was calculated by using the 200%

liquidated damages rate provided for in the Leases. CML Metals signed guaranties for Hopper

Lease #3 and the Locomotive Lease. Neither CML Railroad nor CML Metals has paid WFRC

any amount owing under the Default Judgment. Black Iron filed a motion to vacate the Default

Judgment [Dkt. No. 404]. WFRC filed an objection to the motion to vacate [Dkt. No. 409], but

the matter was never set for hearing nor brought before this Court for decision. As such, the

Default Judgment remains in effect.

### 3. Limitation on Collection

The Stipulated Judgment against CML Metals and the Default Judgment against CML

Railroad, are both based on damages calculated at 200% of the rent for breach of the Leases. The

Court has rejected this calculation, as explained in Section VII.C.1. of this Decision, and wishes

to guard against the possibility that WFRC might seek to use one of those judgments to pursue

relief against the Assets, or against Black Iron or GDC, under the UFTA. The Court is persuaded

by the analysis made by the Texas Appellate Court where it said: "Although a default judgment

may sometimes be used to prove the truth of matters asserted when used against the non-

answering party . . .  they cannot be used to prove the alleged matters against third parties."

*Williams v. Performance Diesel, Inc.*, 2002 WL 596414 at *3 (Tex. App. Ct. 2002) (unpublished

opinion). The damages calculated in a stipulation and in a default against CML Metals and CML

Railroad may not be enforced against Black Iron or GDC, as the damages calculation was

modified by the Court after Black Iron successfully challenged the assessment of the 200%

liquidated damages rate at Trial.

Because the calculation of damages has now been decided on the merits, the damage

awards under the Stipulated Judgment and the Default Judgment would be vulnerable to

amendment if a motion were filed under Bankruptcy Rule 9024(b)(5) on the grounds that

applying the judgments prospectively would no longer be equitable. In the absence of such a

motion, the Court determines that the damages awarded against CML Metals in the Stipulated

Judgment and against CML Railroad in the Default Judgment may not be considered a claim

within the meaning of the UFTA, Utah Code Ann. § 25-6-2(3). The Stipulated Judgment and the

Default Judgment may only be enforced against the parties they were entered against.

## VIII. CONCLUSION

For the forgoing reasons, the Court finds and concludes that the Transfer was a fraudulent

transfer under the UFTA. WFRC's claim under the UFTA is damages for the breach of the

Leases in the amount of $2,134,312.44 plus repair costs of $484,368 for a total of $2,618,680.44.

The Court will award WFRC a judgment against both Black Iron and GDC as the initial

transferees of the Assets.

The Court will award WFRC conversion damages against Black Iron in the amount of

$7,885,584.

Although WRFC prayed for a judgment or for an attachment of the Assets transferred to

Black Iron, no relief from the automatic stay was requested. Accordingly, the Court determines

that WRFC should only be awarded a judgment claim against Black Iron in the amounts set forth

herein. Black Iron is still in an active bankruptcy case, and the claim must be addressed within

the context of the bankruptcy case, as to Black Iron only. As Black Iron was a plaintiff in the

consolidated case [Case No. 17-2088], it has consented to this Court determining the claim as

stated herein. The judgment claim against GDC is not so restricted as there is no automatic stay

in place.

A judgment consistent with this Decision will be entered contemporaneously herewith.

----------------------------------END OF DOCUMENT-------------------------------------

### SERVICE LIST

Service of the foregoing **MEMORANDUM DECISION AFTER TRIAL** shall be made on the following parties through the CM/ECF system:

- Troy J. Aramburu    taramburu@swlaw.com,
  jritchie@swlaw.com,docket_slc@swlaw.com,awayne@swlaw.com
- Ryan C. Cadwallader    rcadwallader@kmclaw.com, tsanders@kmclaw.com
- Bret R Evans    brevans@swlaw.com,
  jritchie@swlaw.com,docket_slc@swlaw.com,awayne@swlaw.com
- Dana T. Farmer    dfarmer@djplaw.com,
  mthatcher@djplaw.com;pbrimley@djplaw.com;mbeaty@djplaw.com
- Douglas Farr    dfarr@swlaw.com, docket_slc@swlaw.com;sballif@swlaw.com
- R. Blake Hamilton    bhamilton@djplaw.com,
  agregson@djplaw.com;mthatcher@djplaw.com;pbrimley@djplaw.com;mbeaty@djplaw.com
- Mark E. Hindley    mehindley@stoel.com,
  rnoss@stoel.com;slcdocket@stoel.com;Dixie.colson@stoel.com
- David J. Jordan    david.jordan@stoel.com, stacy.kamaya@stoel.com
- Penrod W. Keith    pkeith@djplaw.com, khughes@djplaw.com
- Matthew L. Lalli    mlalli@swlaw.com
- David B. Levant    david.levant@stoel.com
- Ellen E. Ostrow    ellen.ostrow@stoel.com,
  Stephanie.hore@stoel.com;docketclerk@stoel.com
- Brian M. Rothschild    brothschild@parsonsbehle.com, ecf@parsonsbehle.com
- Amy F. Sorenson    asorenson@swlaw.com, smoen@swlaw.com
- Jeffrey L. Trousdale    jtrousdale@cohnekinghorn.com, nlakey@cohnekinghorn.com

**By U.S. Mail:** In addition to the parties of record receiving notice through the CM/ECF system, the following parties should be served notice pursuant to Fed. R. Civ. P. 5(b).

David E. Fox
Moore & Van Allen
3015 Carrington Mill Blvd.
Suite 400
Morrisville, NC 27560-6802